[No. S042698. Apr. 6, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT JURADO, JR., Defendant and Appellant.

## COUNSEL

Lynne S. Coffin and Michael T. Hersek, State Public Defenders, under appointment by the Supreme Court, and Mark Hammond, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Larissa Karpovics Hendren and Marvin Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—Defendant Robert Jurado, Jr., appeals from a judgment of death upon his conviction by jury verdict of one count of murder in the first degree (Pen. Code, § 187),[1] with the special circumstance of intentionally killing while lying in wait (§ 190.2, subd. (a)(15)), and one count of conspiracy to commit murder (§§ 182, 187). The jury found that defendant personally used a deadly and dangerous weapon to commit the murder. (§ 12022, subd. (b).) The jury that returned these verdicts as to guilt and special circumstance also returned a penalty verdict of death for the murder. The trial court denied the automatic motion to modify the penalty (§ 190.4, subd. (e)) and sentenced defendant to death.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

This appeal from the judgment of death is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS AND PROCEEDINGS

On May 17, 1991, a stranded motorist saw the body of Teresa (Terry) Holloway in a culvert beneath Highway 163 in San Diego County. She had been strangled and beaten to death two days earlier. As the prosecution's evidence at trial established, defendant killed Holloway, with the help of Denise Shigemura and Anna Humiston, to prevent her from disclosing their plan to kill a drug dealer named Doug Mynatt.[2]

### A. *Prosecution's Guilt Phase Case-in-chief*

In October 1989, Brian Johnsen met Teresa Holloway; a month later, they began living together and continued living together until late April 1991. Throughout this time, Holloway was using methamphetamine on a regular basis. In December 1989, Holloway met Doug Mynatt at a bar and introduced him to Johnsen.

In July or August of 1990, Brian Johnsen met defendant and bought crystal methamphetamine from him at Mark Schmidt's house. Defendant was sharing an apartment with Denise Shigemura, but his girlfriend was Anna Humiston, a high school student who lived with her parents. Johnsen and Teresa Holloway socialized and shared drugs with defendant, Shigemura, and Humiston. Johnsen later introduced defendant to Mynatt.

In October 1990, Denise Shigemura was arrested and remained in federal custody until April 1991, when she was released to a halfway house. During her time in custody, Shigemura exchanged letters and telephone calls with Teresa Holloway. When Shigemura obtained overnight passes from the halfway house, she stayed at the house where Teresa Holloway lived with Brian Johnsen.

In February 1991, Teresa Holloway argued with defendant, and their relationship became strained. Holloway's relationships with Anna Humiston also became strained, and on one occasion they had a quarrel that almost turned violent. Around the same time, Doug Mynatt moved on a temporary

---

[2] Shigemura pled guilty to first degree murder and was sentenced to 25 years to life in state prison. Humiston, who was 17 years old at the time of the killing, was tried as an adult, convicted of first degree murder and conspiracy to commit murder, and sentenced to 25 years to life in state prison. (See *People v. Humiston* (1993) 20 Cal.App.4th 460, 465 [24 Cal.Rptr.2d 515].)

basis into the house that Brian Johnsen and Holloway shared. Johnsen had been buying methamphetamine from Mynatt.

In late March 1991, defendant gave Doug Mynatt a .38-caliber handgun in exchange for drugs. When Mynatt learned that defendant had stolen the gun, he insisted that defendant take it back and instead pay money for the drugs. A few weeks later, Mynatt and Johnsen took defendant from his apartment to Johnsen's house. Mynatt made him stay there overnight until defendant agreed to pay Mynatt and to sell methamphetamine for him. Mynatt threatened to kill defendant if he did not agree.

On April 11, 1991, Brian Johnsen was arrested during a drug raid and spent five days in custody. He was arrested because drugs were found under a couch at his house. Some of the drugs belonged to defendant, but defendant did not admit they were his. Johnsen felt that defendant owed him something because of this incident, and defendant agreed to compensate Johnsen with marijuana.

In late April 1991, Brian Johnsen made Teresa Holloway move out of the house they had shared because of her continuing drug use, and he offered to let Doug Mynatt remain in the house on a more permanent basis as his roommate. Holloway approached Thomas Carnahan, who agreed to let her live in his apartment temporarily. He did not give her a key, and he insisted that she either be in the apartment by 11:00 p.m. or telephone him before that time to let him know when she would be arriving.

On May 6, 1991, Brian Johnsen began serving a 14-day jail sentence for driving with a suspended license. Doug Mynatt continued to live in Johnsen's house. Defendant still owed Mynatt money.

On May 13, 1991, during a telephone conversation, Denise Shigemura told Brian Johnsen (who was still in custody) that Doug Mynatt had stolen her purse, which contained $80, a key to the business where she was then working, and the combination to the business's safe. According to Shigemura, Mynatt admitted taking the purse and said he did it because he suspected Shigemura of stealing $450 from him. Shigemura seemed very upset about the incident and was worried about what Mynatt might do with the business key and the safe combination. During this conversation, defendant phoned Shigemura, and a three-way conversation ensued between defendant, Shigemura, and Johnsen, during which they discussed possibly killing Mynatt. They were worried about potential retaliation, however, because Mynatt had claimed to have a friend who was affiliated with the Hell's

Angels. They agreed to discuss the matter further the next day. They decided not to tell Teresa Holloway about the plan to kill Mynatt because of concern that she would reveal it to the police.

On the same day, Monday, May 13th, defendant telephoned David Colson, with whom he had used methamphetamine, and he asked to borrow a shotgun. Defendant said he "needed to do somebody up," which Colson understood to mean that defendant intended to kill someone. Colson told defendant that he did not own a shotgun, although his brother did, and he gave defendant his brother's telephone number. Defendant called Colson's brother and asked to borrow his shotgun, saying he "had a job to do," but the brother refused to lend the shotgun to defendant.

Around the same time, Denise Shigemura asked Steven Baldwin if he could get her a "gat" (a slang term for a gun). Shigemura explained that she had a problem she needed to take care of. Baldwin told her he could not help her with her problem.

On Tuesday, May 14th, Brian Johnsen telephoned his house from the county jail and spoke to Denise Shigemura. They decided to contact defendant so the three of them could discuss what to do about Doug Mynatt. Johnsen telephoned Anna Humiston's house and spoke briefly to defendant about the plan to kill Mynatt. Defendant said he was still deciding whether to go through with it.

Later on the same day, Tuesday, May 14th, Holloway was at the apartment complex where defendant lived. Larissa Slusher and Ted Meier managed the complex, and they occupied an apartment next to defendant's. Slusher had known Teresa Holloway as a casual acquaintance for seven or eight months. Holloway asked Meier if she could spend the night in their apartment, because it was after 11:00 p.m., and she had been locked out of the apartment where she had been staying. Meier agreed. The next morning, Holloway left the apartment around 8:00 or 9:00 a.m., taking with her a dress that Slusher had loaned her. Before she left, Holloway said she would return later that day, May 15th, but she never did.

On Wednesday evening, May 15th, Brian Johnsen telephoned Mark Schmidt and asked him to bring defendant and Denise Shigemura to Schmidt's house so he could talk to them. Schmidt ran about two and a half blocks to defendant's apartment, where he found Teresa Holloway and Shigemura with defendant. Anna Humiston arrived in a blue Geo Metro while

Schmidt was speaking to defendant. Defendant agreed to take Johnsen's call, and he came to Schmidt's apartment in Humiston's car with Humiston, Shigemura, and Holloway.

At 8:17 p.m. that evening, Brian Johnsen telephoned Schmidt's apartment. Schmidt answered and passed the phone to Shigemura, who said she was still unsure about the plan to kill Mynatt. Defendant then got on the phone and told Johnsen that he could not wait and that it (meaning the killing of Mynatt) would probably happen before Johnsen was released from jail. Johnsen said that was fine with him. Teresa Holloway then got on the phone and asked whether there was a plan to kill Mynatt. Johnsen told her not to get involved.

While Teresa Holloway was speaking on the telephone to Brian Johnsen, defendant had a "forceful talk" with Anna Humiston; he seemed angry about something; she seemed both angry and scared. Defendant then asked Schmidt for a chain that defendant could use to tie up Johnsen's motorcycle so Doug Mynatt could not steal it. Schmidt offered defendant an 18-inch length of plastic weed-eater cord. Defendant wrapped the cord around his own neck, with one end in each fist clenched at shoulder height. He said: "It will do." Denise Shigemura needed to return to her halfway house by 9:00 p.m. At defendant's request, Schmidt told Holloway to get off the phone because he needed to leave the apartment. They all left Schmidt's apartment around 8:45 p.m.

At 9:31 p.m., defendant telephoned Christie Medlin at her apartment. He told her that he was stranded and needed a ride, and that he was calling from a 7-Eleven store. Medlin asked David Silva, her boyfriend, to pick up defendant and his friends. Silva found defendant with Denise Shigemura and Anna Humiston at the 7-Eleven store at Spruce and Fifth Streets. He drove them to Medlin's apartment; when they arrived, Humiston was holding her stomach and appeared to be ill; she told Medlin she had an upset stomach. Defendant seemed bothered by something, and Shigemura seemed agitated. Noticing what appeared to be blood on defendant's socks, Medlin asked him what had happened. Defendant said he "got into a fight." Humiston used Medlin's telephone to call her father to tell him that the blue Geo Metro had broken down. Silva drove Humiston home. Medlin then drove defendant and Shigemura to defendant's apartment.

On Thursday morning, May 16th, around 9:30, a tow truck driver met defendant, Anna Humiston, and Denise Shigemura on Highway 163 near the Quince Street Bridge, where the blue Geo Metro was parked. The driver

towed the car to the apartment complex where defendant lived. He observed nothing unusual about their demeanor. Humiston signed the towing receipt.

On the afternoon of the same day, Thursday, May 16th, defendant and Denise Shigemura went to David Silva's apartment, and the three shared pizza and beer. Shigemura asked defendant and Silva to "bruise her up" so she could say she had been beaten and would have an excuse for not returning to her halfway house the previous night. Defendant and Silva then hit Shigemura with their fists. When defendant and Shigemura later went to Mark Schmidt's apartment, Shigemura removed her shirt to show Schmidt the bruises on her chest and arms. She told Schmidt that she had been "jumped" the previous night.

During the same day, defendant and Denise Shigemura went to Steven Baldwin's house with Mark Schmidt. They sat in the living room, with Baldwin and Schmidt on one couch, defendant and Shigemura on another. Shigemura said to Baldwin: "I no longer need what it was I asked you for. We took care of the problem and we dumped the body at Balboa Park." Defendant said nothing; his face had what Baldwin described as an "empty look."

On Friday morning, May 17th, Joseph Hedley experienced engine trouble as he was driving a van on Highway 163 through Balboa Park. He parked the van beside the freeway and began walking to a telephone call box about 100 yards away. As he neared the call box, he noticed a human foot protruding from a culvert that ran beneath the freeway. Approaching closer, he saw a woman's body inside the culvert, where it was not visible to persons traveling on the freeway. He called to her but received no response. Using the call box, Hedley reported what he had seen. Police officers arrived 15 minutes later and found that the body was Teresa Holloway's.

During the autopsy of Teresa Holloway's body, Mark A. Super, a deputy medical examiner employed by the San Diego County Medical Examiner's Office, saw many injuries on the face, torso, and extremities. Contusions and abrasions were on the chest and on both legs and both arms, with the right hand being particularly bruised and swollen. Some of the abrasions showed clusters of short parallel linear marks suggesting they were made by an object with threads. There were many bruises and abrasions on the neck, including some marks that could have been made by ligature or manual strangulation. The hyoid bone was fractured and there were hemorrhages in the eyeballs; both of these findings were consistent with strangulation. There was a bite mark in the center of the back. The most extensive injuries were to the face

and head. The jaw and all the facial bones were fractured and some had caved in. There were many deep lacerations on the scalp, and the skull was fractured. In Super's expert opinion, a scissor jack had "all the characteristics that one would expect" in the weapon that inflicted the injuries he observed. The cause of death was "blunt force head injuries and strangulation."

On Friday evening, May 17th, James R. Manis, a sergeant with the San Diego Police, found defendant with Anna Humiston outside defendant's apartment complex. He told defendant he was investigating the death of Teresa Holloway. Defendant said that he knew Holloway, that he had last seen her about three days before at a party at the house of a man named Mark, that she was a drug user who owed money to drug dealers, and that he did not trust her because she had stolen from him. Defendant led Sergeant Manis to Holloway's car, which was parked about three or four blocks from defendant's apartment.

On Saturday morning, May 18th, defendant and Anna Humiston arrived at David Silva's apartment in a new car that Humiston's parents had just given her. They then drove to defendant's apartment, where Sergeant Manis arrested them. Later that day, Sergeant Manis found a scissor jack in a tree midway between the place where Teresa Holloway's body was found and the 7-Eleven store at the corner of Spruce and Fifth Streets where David Silva had found defendant, Shigemura, and Humiston on the night of the murder. The jack was covered with red stains and had hair attached to it. Denise Shigemura was arrested on the same day.

After his arrest, defendant made telephone calls from the jail to Brian Johnsen, Christie Medlin, and David Silva. When Johnsen asked defendant why he had killed Teresa Holloway, defendant said it had to be done. To Medlin, defendant sang "On, on, that bitch is gone." According to Medlin's trial testimony, defendant said "something like he doesn't really care if he has to spend the rest of his life paying for this, the bitch is gone." When Silva asked defendant about Holloway's death, defendant told him that Holloway was killed in a car, that he had been sitting in the backseat with Humiston while Shigemura was driving and Holloway was sitting in the front passenger seat, and that an argument "got out of hand."

Around May 19th, Larissa Slusher saw the dress she had loaned Teresa Holloway in a dumpster about 100 feet from defendant's apartment. With the dress were Holloway's purse, her wallet, her identification papers, photographs of her daughter, a sandal that matched one found at the murder scene, and a pair of shoes belonging to defendant.

Gary Mark Dorsett, an evidence technician for the San Diego Police Department Crime Lab, examined the blue Geo Metro. He collected samples of red stains from the front passenger seat cover and seatbelt harness and from the rear floorboard carpet on the passenger side. There was no jack in the car.

Norman Donald Sperber, a forensic dentist, compared the bite mark on Holloway's back with dental impressions from defendant, Denise Shigemura, and Anna Humiston. In Sperber's opinion, defendant's teeth were "highly consistent" with the bite mark, but neither Shigemura nor Humiston could have made it.

At trial, as part of the prosecution's case, the parties stipulated to the results of blood analysis. The blood on the scissor jack and on the rear floorboard of the blue Geo Metro was consistent with Teresa Holloway's blood, but inconsistent with the blood of defendant, Denise Shigemura, and Anna Humiston. Blood on the sandal and purse found in the dumpster, and on the front passenger seat cover of the blue Geo Metro, was consistent with the blood of all four of these individuals.

The parties also stipulated to the results of hair comparison analysis. Ten of the hairs found in Teresa Holloway's hand were consistent with the hair of Anna Humiston but not with the hair of defendant, Denise Shigemura, or Teresa Holloway. Four of the hairs were consistent with the hair of both Humiston and Holloway, but not with the hair of defendant or Shigemura, and three of the hairs were inconsistent with Humiston's hair and were not compared to the hair of defendant, Shigemura, or Holloway.

B. *Defense Case at the Guilt Phase*

After defendant's arrest, Brian Johnsen went to the house of Josephine Jurado, defendant's mother, and knocked on the door of her house one night around 9:30. Without opening the door, she asked Johnsen who he was and what he wanted. Johnsen said he wanted a helmet he had lent to defendant. She told him she did not have the helmet and did not know where it was, but Johnsen would not leave. She was frightened because she knew that Teresa Holloway had been Johnsen's girlfriend and that defendant had been charged with her murder. Johnsen eventually left after defendant's mother telephoned the police.

On May 19, 1991, during a 10-minute interview, San Diego Police Officer David Swiskowski asked Mark Schmidt to describe what happened at

Schmidt's apartment on the evening of May 15, 1991, before Teresa Holloway's murder, but Schmidt's replies were vague and evasive. Schmidt said that defendant, Holloway, Anna Humiston, and Denise Shigemura came to his apartment that evening around 8 o'clock, and that he received a phone call from Brian Johnsen. Schmidt told Swiskowski that he gave the phone to defendant, and that defendant and Holloway were alone in his bedroom with the phone for about 10 minutes. Schmidt did not say anything to Swiskowski about having to leave the apartment, or making up a story about having to leave the apartment, or that defendant put a cord around his neck.

On the same day, May 19th, during an interview that lasted 10 to 15 minutes, David Silva told Officer Swiskowski that defendant had called him from jail after being arrested for Teresa Holloway's murder. Silva told Swiskowski that during that conversation defendant did not talk about the murder except to say that he had been charged with it. Silva did not tell Swiskowski that defendant said Holloway was killed because she was a snitch, nor did Silva say that defendant had described where persons were seated in Humiston's car before or during the murder.

On September 10, 1991, Tony Bento, an investigator for the San Diego District Attorney, interviewed David Silva for around 25 minutes. During the interview, Silva said he had talked to defendant on several occasions after defendant's arrest, and that defendant had always denied killing Teresa Holloway and never said that she had been killed because she had overheard a conversation, or that she was killed because an argument got out of hand. At the end of the interview, however, Silva mentioned a conversation with defendant *before* Holloway's death during which defendant had said that Holloway had overheard something and she "was going to snitch him off about something."

On September 16, 1991, Tony Bento interviewed Brian Johnsen for at least an hour, during which Johnsen said that after defendant's arrest, defendant called and told him to stay away from defendant's family or "the same thing would happen to them." Bento understood "them" as a reference to Johnsen and his friends. In this interview, Johnsen never said that defendant told him that Terry Holloway was killed because it had to be done. Johnsen also told Bento that he had discussed with Jeffrey Latimer the plan to kill Doug Mynatt.

Jeffrey Latimer was a childhood friend of Brian Johnsen's and through him met defendant and Doug Mynatt. Latimer testified that he never discussed with Johnsen a plan to kill Mynatt, and that to his knowledge Johnsen had "never really been honest" and "was always the crook and the thief."

In 1991, Richard Whalley, a forensic scientist and toxicologist, arranged to have a private laboratory retest the urine sample taken from defendant after his arrest. The urine was found to contain methamphetamine at a very low level (130 nanograms) that would not have caused any effect but which suggested that defendant had probably used methamphetamine during the previous two to four days.

In January 1992, Marion Louise Pasas, a licensed private investigator whom Anna Humiston's attorney had retained, interviewed Christie Medlin at her apartment. Medlin told Pasas that after Teresa Holloway's murder defendant had called Medlin from jail on one occasion, but during that conversation defendant did not talk about the murder. Medlin did not tell Pasas that defendant said he was glad Holloway was dead or that he said he did not care whether he spent the rest of his life in jail or in prison.

## C. *Prosecution's Penalty Phase Case in Aggravation*

Before August 1988, while defendant was living with his mother and his sister in an apartment in San Marcos, he once became highly agitated and upset, pushed his mother slightly against a bed, and spit in her face. Another incident occurred later while defendant was living with his mother and sister in a house in San Diego. On this occasion, defendant came home very upset after having broken up with his girlfriend, threatened to obtain weapons and shoot up the house, threatened to kill his mother, and advanced toward her with a raised hand as if to strike her. Defendant's friends restrained him and took him outside. When defendant's sister tried to telephone the police, defendant grabbed the phone from her hand. After this incident, in December 1989, defendant's mother applied for a restraining order to have him removed from her house.

In October 1990, defendant was convicted of felony possession of marijuana for sale.

In May 1991, during the autopsy of Teresa Holloway's body, she was found to have been pregnant. The fetus, which was around 17 weeks old, was too young and too small to have survived outside the womb, but it showed no evidence of traumatic injury or other condition that would have precluded its survival to full term and birth had Holloway not died. Some weeks before her death, Holloway had told defendant that she was pregnant, but defendant did not believe her. Holloway said she was planning to get a pregnancy test and that when she got the test result she would show it to defendant to prove she was pregnant.

On July 21, 1991, Steven Baldwin was booked into the county jail for a probation violation. As a deputy was escorting him to a holding tank,

defendant, who was inside the tank, saw him and said to another inmate: "I know that dude. He's the reason I'm in here. He told the cops I killed that bitch." After the deputy had placed Baldwin in the tank, an inmate named Richard Janssen, whom Baldwin did not know, approached him and struck him. Baldwin was then hit several times, from different directions, on the back of the head and the side of the face. Defendant did not strike him, but when the beating stopped, defendant came out of a side cell and told Baldwin: "You can't be in this cell. You got to roll up out of this cell." Baldwin lost consciousness, and the next thing he remembered was being outside the tank on a gurney. As a result of the beating, Baldwin suffered injuries to the left side of his face, including bruising and swelling both above and below the eye, a laceration below the eye, and a nondisplaced fracture of the malar bone.

On September 5, 1993, a fight broke out among inmates in module 5-B of the county jail in San Diego. Deputies arriving at the module observed 15 to 20 Hispanic inmates on one side of the module faced off against eight to 10 Black inmates on the other side of the module. The inmates were yelling and throwing things back and forth, and some inmates had bloodstained towels wrapped on their arms. Defendant was in the group of Hispanic inmates and was one of at least four inmates holding metal bars, 12 to 18 inches in length and one-quarter inch in diameter, that had been removed from inmate bunks. The inmates were slamming these bars against bunks and making stabbing motions with them toward Black inmates, although defendant was not seen to strike anyone. After the inmates were removed, the deputies found many items that could be used as weapons scattered throughout the module, including 13 metal bars, seven wooden mop handle pieces, two razors, one razor blade attached to a comb, three wooden window grate pieces, and two socks containing soap bars.

Teresa Holloway's murder deeply affected her parents, James and Joan Cucinotta, and her daughter, who at the time of Teresa Holloway's death was four years old and lived with her father. After the daughter learned of her mother's death, she became sad and withdrawn and cried a lot. She often said: "I want my Mommy, I want my Mommy."

A police detective came to the home of James and Joan Cucinotta to tell them of Teresa Holloway's death. At first Joan could not accept it; she was very upset and angry, and she tried to hit the detective. When he said they had identified Teresa Holloway's body through fingerprints, Joan fell apart and became hysterical. Some friends and family came over to be with her. That night and for days afterwards, she was unable to eat or sleep. She just cried and smoked cigarettes. She was unable to deal with making the funeral arrangements or telephoning relatives, so James Cucinotta did those things.

James Cucinotta, Terry Holloway's father, was also seriously affected by her murder. At the time of her death, he worked in law enforcement as an investigator, but within two weeks after learning of the murder, he lost his job because he was no longer able to function. He began drinking heavily until eventually he went into a treatment center. He and his wife Joan both received treatment from psychiatrists for their grief. The murder also deeply affected their two other children, Teresa Holloway's brother and sister, and family holidays became very painful. At the time of his testimony, more than four years after Teresa Holloway's death, James Cucinotta and his wife continued to visit Teresa's grave every week. Joan Cucinotta sometimes took Teresa's daughter to the grave.

### D. *Defense Penalty Phase Case in Mitigation*

Calvin Bruce was one of the inmates in module 5-B of the county jail in San Diego on September 5, 1993. He was talking on the phone to his wife when he saw two inmates, one Black and the other Hispanic, have a confrontation that became physical and resulted in a face-off between groups of Black and Hispanic inmates during which inmates in both groups wielded and threw metal pipes. According to Bruce, defendant was not one of the original combatants, he did not have any weapon in his hand during the incident, and he tried unsuccessfully to persuade other inmates to stop the fighting.

Defendant's parents—Robert Jurado, Sr., and Josephine Jurado—married in 1968. Defendant was born in June 1970, and his sister Oralia in November 1973. At that time, the family lived in Los Banos. Once, when he was around four years old, defendant saw his father hit his mother. Defendant ran up to his mother and hugged her.

In 1973, defendant's parents separated, and defendant began to experience "tremendous headaches that would make him cry a lot." He also developed a fear of sleeping in the dark, and he became more rebellious with his mother. After the separation, defendant's father saw his children no more than once or twice a year.

In 1977, defendant's parents finalized their divorce. In 1984, defendant's mother moved to San Diego. His father never went there to visit, and he telephoned very seldom. Around 1985, defendant's father remarried. In 1986, defendant's grades began to fail and he began to use drugs. In 1987 or 1988, defendant's mother placed him in a drug treatment program. When he learned that defendant was using illegal drugs, defendant's father cut all ties with defendant. Around this time, a psychiatrist told defendant's mother that defendant was suicidal and needed to be hospitalized right away. When

defendant's mother telephoned his father to get some insurance papers to cover defendant's hospitalization, defendant's father said something to the effect that it might be better if defendant did commit suicide.

Defendant's father testified that he had seen defendant once since his arrest and could now form a relationship with him because defendant was no longer using drugs.

Before moving to San Diego with his mother in 1984, defendant had close relationships with his aunt, Patricia Camacho, and his two grandmothers, Josefina Martinez and Paz Jurado. They each testified that they love defendant very much and intended to visit him in prison. Defendant's mother and his sister Oralia both testified that they love defendant very much, that they had visited defendant weekly since his arrest, and that they intended to continue visiting him in prison.

## II. Pretrial and Jury Selection Issues

### A. *Double Jeopardy*

The District Attorney of San Diego County filed an amended information charging defendant with murder (§ 187) and conspiracy to commit murder (§§ 182, 187), and alleging a lying-in-wait special circumstance (§ 190.2, subd. (a)(15)) making defendant eligible for the death penalty. Defendant filed a motion under section 995 to set aside the conspiracy count and the lying-in-wait special-circumstance allegation on the ground that they were not adequately supported by the evidence presented at the preliminary hearing. The prosecution filed written opposition to the motion, and the trial court, after a hearing, denied the motion to dismiss as to the conspiracy count, but the court granted the motion as to the special circumstance allegation.

Immediately after the court made its ruling dismissing the special circumstance allegation, defendant announced his intention to plead guilty to the remaining charges. The prosecutor stated that his office might seek appellate review of the ruling setting aside the special circumstance by petitioning the Court of Appeal for a writ of mandate, and that for this reason he would not sign the change of plea form if defendant pled guilty to the remaining charges. Defendant then withdrew his previous not-guilty pleas and pled guilty to the remaining charges.

To challenge the ruling setting aside the special circumstance allegation, the prosecution petitioned the Court of Appeal for a writ of mandate. (See *People v. Superior Court (Jurado)* (1992) 4 Cal.App.4th 1217 [6 Cal.Rptr.2d 242].) The Court of Appeal stayed defendant's sentencing hearing, which had

been scheduled for December 23, 1991. In his opposition to the writ petition, defendant argued that because he had already pled guilty to the remaining charges, any further prosecution of the special circumstance allegation would violate the double jeopardy clauses of the federal and state Constitutions (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15), and for this reason the special circumstance allegation could not be reinstated even if the trial court had erred in dismissing it. (See *People v. Superior Court (Jurado), supra,* at p. 1229.)

The Court of Appeal held that the trial court had erred in dismissing the special circumstance allegation under section 995 (*People v. Superior Court (Jurado), supra,* 4 Cal.App.4th at p. 1229) and also that there was no double jeopardy bar to reinstatement and prosecution of the special circumstance allegation (*id.* at pp. 1235–1236). In granting the petition for writ of mandate, the Court of Appeal directed the trial court to enter a new order denying defendant's section 995 motion in its entirety, thereby reinstating the special circumstance allegation. (*People v. Superior Court (Jurado), supra,* at p. 1236.) This court denied defendant's petition for review. (*Ibid.*) Defendant then withdrew his guilty pleas, pled not guilty to the charges, and denied the special circumstance allegation.

Defendant here raises the same double jeopardy issue he raised unsuccessfully in opposing the prosecutor's pretrial writ petition in the Court of Appeal. The Attorney General argues that defendant's claim is barred by the law of the case doctrine.

■ Under the doctrine of the law of the case, a principle or rule that a reviewing court states in an opinion and that is necessary to the reviewing court's decision must be applied throughout all later proceedings in the same case, both in the trial court and on a later appeal. (*People v. Turner* (2004) 34 Cal.4th 406, 417 [20 Cal.Rptr.3d 182, 99 P.3d 505]; *People v. Barragan* (2004) 32 Cal.4th 236, 246 [9 Cal.Rptr.3d 76, 83 P.3d 480]; *People v. Stanley* (1995) 10 Cal.4th 764, 786 [42 Cal.Rptr.2d 543, 897 P.2d 481].) We apply the doctrine even in death penalty cases, and even when the previous decision was rendered by a Court of Appeal, but we do not apply it when an intervening decision has altered or clarified the controlling rules of law, or when the rule stated in the prior decision was a " 'manifest misapplication' of the law resulting in 'substantial injustice.' " (*People v. Stanley, supra,* at p. 787; accord, *People v. Gray* (2005) 37 Cal.4th 168, 197 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

Defendant argues that both of the recognized exceptions to the doctrine of the law of the case—intervening change in the law and manifest misapplication of existing legal principles resulting in substantial injustice—are present here. To evaluate his arguments, we begin by reviewing the Court of Appeal's decision.

The Court of Appeal framed the issue this way: "Jurado's response to the People's petition presents the question of whether the prejeopardy dismissal of the special circumstance allegation pursuant to Jurado's motion under section 995 and his immediate guilty plea without the concurrence of the prosecutor and before the prosecutor could seek pretrial review of that dismissal would result in a 'second prosecution' for the same offense after 'acquittal' or 'conviction.' " (*People v. Superior Court (Jurado), supra,* 4 Cal.App.4th at pp. 1229–1230.) The court concluded, first, that dismissal of the special circumstance allegation under section 995 was a prejeopardy rather than a postjeopardy determination. (*People v. Superior Court (Jurado), supra,* at pp. 1230–1231.) The court concluded, second, that the lying-in-wait special circumstance was not "an added element which would create a greater offense out of the charged murder," but instead was a "penalty enhancement." (*Id.* at p. 1231.) Third, the court concluded, after distinguishing certain decisions that defendant cited, that this case "most closely resembles" *Ohio v. Johnson* (1984) 467 U.S. 493 [81 L.Ed.2d 425, 104 S.Ct. 2536] (*Johnson*). (*People v. Superior Court (Jurado), supra,* at p. 1233.)

In *Johnson,* a defendant charged with four offenses arising from the same incident pled guilty to two of the offenses—involuntary manslaughter and grand theft—after which, on the defendant's motion, the trial court dismissed the other two charges—murder and aggravated robbery—"on the ground that because of his guilty pleas, further prosecution on the more serious offenses was barred by the double jeopardy prohibitions of the Fifth and Fourteenth Amendments." (*Johnson, supra,* 467 U.S. at p. 494.) The United States Supreme Court concluded, to the contrary, that "prosecuting [the defendant] on the two more serious charges would not constitute the type of 'multiple prosecution' prohibited by the Double Jeopardy Clause." (*Ibid.*)

█ The high court explained that the federal Constitution's double jeopardy clause protects against (1) a second prosecution for the same offense after acquittal or conviction and (2) multiple punishment for the same offense. (*Johnson, supra,* 467 U.S. at p. 498.) The bar against a subsequent prosecution after acquittal or conviction "ensures that the State does not make repeated attempts to convict an individual, thereby exposing him to continued embarrassment, anxiety, and expense, while increasing the risk of an erroneous conviction or an impermissibly enhanced sentence," while the bar against multiple punishment for a single offense "is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature." (*Id.* at pp. 498–499.) The court concluded that the issue of multiple punishment was not yet presented because the defendant had never been tried for, convicted of, or sentenced for the more serious offenses of murder and aggravated robbery. (*Id.* at pp. 499–500.) "While the Double Jeopardy Clause may protect a defendant against cumulative punishments for

convictions on the same offense, the Clause does not prohibit the State from prosecuting respondent for such multiple offenses in a single prosecution." (*Id.* at p. 500.)

The court also rejected the argument that further prosecution of the murder and aggravated robbery charges would violate the double jeopardy prohibition against successive prosecutions: "No interest of respondent protected by the Double Jeopardy Clause is implicated by continuing prosecution on the remaining charges brought in the indictment. Here respondent offered only to resolve part of the charges against him, while the State objected to disposing of any of the counts against respondent without a trial. . . . There simply has been none of the governmental overreaching that double jeopardy is supposed to prevent. On the other hand, ending prosecution now would deny the State its right to one full and fair opportunity to convict those who have violated its laws." (*Johnson, supra,* 467 U.S. at pp. 501–502.)

Here, the Court of Appeal rejected defendant's attempts to distinguish *Johnson, supra,* 467 U.S. 493. Defendant argued that the prosecutor here did not sufficiently object to defendant's guilty pleas. As the Court of Appeal pointed out, however, the prosecutor advised the trial court that his office might seek appellate review of the dismissal of the special circumstance allegation, and the trial court advised defendant of the possibility that the special circumstance would be reinstated. (*People v. Superior Court (Jurado),* *supra,* 4 Cal.App.4th at pp. 1234–1235.) The Court of Appeal concluded: "Jurado was never in jeopardy for the special circumstance, nor was he ever convicted or acquitted of that charge. Since the special circumstance is not in a lesser- or greater-offense relationship to the murder, there is no reason to allow Jurado's tactical maneuver to deny the People the right to a trial on the merits of that allegation." (*Id.* at pp. 1235–1236.)

Defendant argues, first, that the United States Supreme Court's decision in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], constitutes an intervening change in the law establishing that a special circumstance making a defendant eligible for the death penalty is the functional equivalent of an element of a greater offense of capital murder. We need not decide whether defendant is correct that a special circumstance is, for double jeopardy purposes, the functional equivalent of an element of a greater offense. Even if that is true, and the Court of Appeal erred in stating otherwise, it does not assist defendant because it is not a basis for distinguishing *Johnson, supra,* 467 U.S. 493. There, the high court accepted the Ohio Supreme Court's determination that the defendant could not be convicted of both murder and involuntary manslaughter for the same killing, but it nonetheless concluded that a guilty plea to involuntary manslaughter did not bar prosecution for murder under the facts of that case. (*Johnson, supra,* 467 U.S. at pp. 496–497

& fn. 6.) So also here, for purposes of double jeopardy analysis under the facts shown, it makes no difference whether a special circumstance is or is not an element, or the functional equivalent of an element, of a greater offense.

Defendant's second argument is that *Johnson, supra,* 467 U.S. 493, is distinguishable, and that the Court of Appeal's reliance on that decision was a manifest misapplication of the law, because unlike the defendant in *Johnson,* he pled guilty to all charges then pending against him and the prosecutor openly and actively participated in the taking of these pleas. We are unpersuaded that these slight differences are significant. The prosecution charged defendant with murder with a special circumstance allegation, it timely sought review of the trial court's erroneous dismissal of the allegation, and it did not acquiesce in defendant's guilty plea to the murder charge. The prosecutor's participation in the taking of the guilty plea, primarily in the form of insisting that an adequate factual basis be demonstrated, was not an "effort to prosecute the charges seriatim" (*Johnson, supra,* 467 U.S. at p. 500, fn. 9) and did not pose the risks that the successive prosecution aspect of the double jeopardy bar was intended to guard against—"repeated attempts to convict an individual, thereby exposing him to continued embarrassment, anxiety, and expense, while increasing the risk of an erroneous conviction or an impermissibly enhanced sentence" (*id.* at pp. 498–499). As in *Johnson,* there was "none of the governmental overreaching that double jeopardy is supposed to prevent," and imposing a double jeopardy bar "would deny the State its right to one full and fair opportunity to convict those who have violated its laws." (*Id.* at pp. 501–502.)

Because defendant has not shown that the Court of Appeal's decision rejecting his double jeopardy claim was a manifest misapplication of the law, that it resulted in substantial injustice, or that there has been an intervening change in the controlling law, the Court of Appeal's decision is the law of the case on that issue.

### B. *Vindictive Prosecution*

On July 6, 1992, after the Court of Appeal's decision reinstating the special circumstance allegation became final, the prosecutor announced that his office had decided to seek the death penalty against defendant. On August 20, 1992, defendant filed a motion to bar the prosecutor from seeking the death penalty on the ground that the decision to do so was vindictive. On September 4, 1992, the prosecutor filed written opposition to the motion, and on September 11, 1992, defendant withdrew his guilty pleas and entered pleas of not guilty. Also on September 11, 1992, the trial court denied the motion alleging vindictive prosecution. Defendant now claims the trial court erred in so ruling.

■ "Absent proof of invidious or vindictive prosecution, as a general matter a defendant who has been duly convicted of a capital crime under a constitutional death penalty statute may not be heard to complain on appeal of the prosecutor's exercise of discretion in charging him with special circumstances and seeking the death penalty." (*People v. Lucas* (1995) 12 Cal.4th 415, 477 [48 Cal.Rptr.2d 525, 907 P.2d 373].) But the due process clauses of the federal and state Constitutions (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, §§ 7, 15) forbid the prosecution from taking certain actions against a criminal defendant, such as increasing the charges, in retaliation for the defendant's exercise of constitutional rights. (*United States v. Goodwin* (1982) 457 U.S. 368, 372 [73 L.Ed.2d 74, 102 S.Ct. 2485]; *In re Bower* (1985) 38 Cal.3d 865, 880, fn. 7 [215 Cal.Rptr. 267, 700 P.2d 1269].) It is not a constitutional violation, however, for a prosecutor to offer benefits, in the form of reduced charges, in exchange for a defendant's guilty pleas, or to threaten to increase the charges if the defendant does not plead guilty. (*Bordenkircher v. Hayes* (1978) 434 U.S. 357, 365 [54 L.Ed.2d 604, 98 S.Ct. 663]; see *People v. Collins* (2001) 26 Cal.4th 297, 309, fn. 4 [109 Cal.Rptr.2d 836, 27 P.3d 726].) In the pretrial setting, there is no presumption of vindictiveness when the prosecution increases the charges or, as here, the potential penalty. (*United States v. Goodwin, supra,* at pp. 381–382; *People v. Michaels* (2002) 28 Cal.4th 486, 515 [122 Cal.Rptr.2d 285, 49 P.3d 1032].) Rather, the defendant must "prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something the law plainly allowed him to do." (*United States v. Goodwin, supra,* at p. 384, fn. omitted; *People v. Michaels, supra,* at p. 515.)

The only evidence defendant submitted to the trial court to prove his claim of vindictive prosecution was a declaration by his trial attorney recounting certain events leading up to the prosecutor's announcement of the decision to seek the death penalty. On August 16, 1991, when defendant was arraigned on an information charging him with the murder of Teresa Holloway and alleging the special circumstance of lying in wait, the prosecutor, Deputy District Attorney Mark Pettine, announced that his office was not seeking the death penalty. On October 11, 1991, an amended information was filed adding the charge of conspiracy to commit murder. On November 15 to 19, 1991, Brian Johnsen testified at a conditional examination, describing how he and defendant had discussed a plan to kill Doug Mynatt and how defendant later admitted killing Teresa Holloway because "it had to be done." Two days later, on November 21, the trial court dismissed the special circumstance allegation and defendant pled guilty to the remaining charges.

The prosecution then challenged the dismissal of the special circumstance allegation by petitioning the Court of Appeal for a writ of mandate. In late March or early April of 1992, after the Court of Appeal had granted the petition, but before its decision had become final, Deputy District Attorney

Pettine told defendant's trial attorney that if defendant withdrew his guilty pleas, Pettine would talk to the district attorney about whether to seek the death penalty, but if defendant did not withdraw the guilty pleas it was likely that the death penalty would not be sought.[3] A few weeks later, however, Pettine advised defense counsel that he intended to discuss the death penalty with the district attorney whether or not defendant withdrew his guilty pleas, but he implied that the death penalty might not be sought if defendant admitted the special circumstance allegation. On July 6, 1992, at a hearing in superior court to discuss the status of the case, after defense counsel announced that this court had denied defendant's petition for review of the Court of Appeal's decision reinstating the special circumstance allegation, Deputy District Attorney Pettine stated that he had again met with the district attorney, who had decided to seek the death penalty against defendant, and that he had immediately advised defense counsel of that decision.

Like the trial court, we see in this sequence of events no evidence that the prosecution's decision to seek the death penalty against defendant was motivated by a desire to punish defendant for making the motion to dismiss the special circumstance allegation under section 995, for pleading guilty and attempting to assert a double jeopardy bar, for opposing the prosecution's writ petition in the Court of Appeal, or for petitioning this court to review the Court of Appeal's decision. Although the discussions between Deputy District Attorney Pettine and defense counsel suggest that the decision to seek the death penalty may have been influenced to some extent by defendant's decision to deny the special circumstance allegation, this was not an impermissible consideration. (*Bordenkircher v. Hayes, supra,* 434 U.S. at p. 365; *People v. Collins, supra,* 26 Cal.4th at p. 309, fn. 4.)

Defendant argues, in substance, that the prosecution's decision to seek the death penalty against defendant must have been motivated by a desire to punish him for challenging the validity of the special circumstance allegation through his section 995 motion because nothing else of significance occurred between August 16, 1991, when the prosecutor said his office was not seeking the death penalty, and July 6, 1992, when the prosecutor said it was. We disagree. In September 1991, Brian Johnsen told prosecution investigators of defendant's involvement in a plan to kill Doug Mynatt; in November 1991, the

---

[3] On April 27, 1992, the trial court held a hearing to discuss the status of the case. Defense counsel announced that defendant intended to petition this court for review of the Court of Appeal's decision reinstating the special circumstance allegation, and that regardless of the outcome of that effort defendant did not intend to withdraw his guilty pleas. Deputy District Attorney Pettine announced that he had discussed with the district attorney whether to seek the death penalty, and the district attorney said that no decision would be made until defendant decided whether he would withdraw his guilty pleas. Pettine said he would discuss the matter with the district attorney again in light of defendant's decision not to withdraw his guilty plea, but he explained that "all options are still open."

prosecutor conditionally examined Brian Johnsen and assessed the credibility of his testimony; and, in early 1992, at Anna Humiston's trial for the murder of Teresa Holloway, the prosecution had an opportunity to assess the strength of its case. These events could well have caused the prosecution to reassess its decision about the appropriate penalty in this case.

Defendant argues that Brian Johnsen's information could not have been significant because the prosecution did not decide to seek the death penalty until many months after receiving that information. We disagree. Because of its concerns for the safety of Brian Johnsen and Doug Mynatt, the prosecution decided to conditionally examine Johnsen immediately after disclosing the information obtained from him. Two days after that conditional examination ended, the trial court dismissed the special circumstance allegation. It was only months later that the special circumstance was reinstated, and the prosecution then immediately reassessed its decision and announced its intention to seek the death penalty. Thus, the actual window of time for the prosecution to act on Brian Johnsen's information was not many months, as defendant asserts, but only a few days. No inference of improper motive arises from the prosecution's failure to act during this brief period. Moreover, the decision to seek the death penalty ultimately did not rest on Johnsen's information alone, but also on the prosecution's opportunity to preview its case at the Humiston trial, including the testimony of Denise Shigemura.

Because defendant did not present evidence of a vindictive motive for the prosecution's decision to seek the death penalty, the trial court did not err in denying defendant's motion to bar the prosecution from seeking that penalty.

### C. *Voir Dire Procedures*

In *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301], this court decided that in capital prosecutions the death-qualification portion of each prospective juror's voir dire should be sequestered, meaning that it should be conducted out of the presence of other prospective jurors. This court did not hold that sequestered voir dire was constitutionally required; instead, we mandated this practice as a rule of procedure. (See *People v. Vieira* (2005) 35 Cal.4th 264, 286–287 [25 Cal.Rptr.3d 337, 106 P.3d 990]; *People v. Cudjo* (1993) 6 Cal.4th 585, 628 [25 Cal.Rptr.2d 390, 863 P.2d 635].) In 1990, however, the voters abrogated this aspect of *Hovey* by enacting Proposition 115, which added section 223 to the Code of Civil Procedure. That statute provides, in part, that "where practicable" the trial court must conduct voir dire "in the presence of the other jurors in all criminal cases, including death penalty cases." (Code Civ. Proc., § 223.)

The jury selection process in this case began with hardship screening, after which the remaining prospective jurors filled out a lengthy juror questionnaire. To comply with the statutory mandate that voir dire occur in the presence of other jurors "where practicable" (Code Civ. Proc., § 223), the trial court decided to conduct voir dire, including questioning about the death penalty, with small groups of 10 prospective jurors. Before the voir dire of the first small group, the defense requested individual voir dire of five prospective jurors who, in the view of defense counsel, had "expressed very strong attitudes toward the death penalty" in their questionnaire responses. The trial court denied the request but stated that it would reconsider the matter based on the individual jurors' answers during voir dire. Thereafter, however, the court agreed to separate[4] or sequestered voir dire of prospective jurors whose questionnaire responses indicated strong opposition to the death penalty, and the court said that it would do the same if questionnaire responses indicated a bias in favor of the death penalty. The court followed this procedure during the remainder of the voir dire, providing sequestered death-qualification voir dire for any juror who had expressed particularly strong views about the death penalty, either for or against, in filling out the questionnaire, and inviting counsel to assist in identifying the prospective jurors for whom sequestered voir dire would be appropriate. After nearly 100 prospective jurors had been questioned on voir dire in this manner, and challenges for cause had been made and ruled upon, the jury selection process was completed by the exercise of peremptory challenges. The defense expressed satisfaction with the jurors selected, and they were sworn to try the case.

Defendant contends that the trial court's failure to conduct sequestered death-qualification voir dire—that is, to question each prospective juror on subjects relating to the death penalty out of the presence of other prospective jurors—violated his rights under the federal Constitution to due process, equal protection, jury trial, effective assistance of counsel, and a reliable penalty verdict, and his right under California law to individual juror voir dire when group voir dire is not practical.

Insofar as defendant contends that the federal Constitution requires sequestered death-qualification voir dire of *every* prospective juror in a capital case, the claim has been frequently rejected by this court and is without merit. (*People v. Stitely* (2005) 35 Cal.4th 514, 536–537 [26 Cal.Rptr.3d 1, 108 P.3d 182]; *People v. Vieira, supra,* 35 Cal.4th at pp. 286–287; *People v. Box* (2000) 23 Cal.4th 1153, 1180 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

---

[4] In some instances, jurors who expressed strong death penalty views on the questionnaire responses were questioned with others who had expressed similar views but out of the presence of jurors who had not expressed such views.

Insofar as defendant contends that the trial court violated his rights under the federal Constitution and under California law by failing to exercise its discretion to consider whether group voir dire was "practicable," the record in this case does not support his claim. Rather, the trial court clearly understood it had discretion to order individual voir dire, and it did so for those jurors whose questionnaire responses suggested strong and possibly disqualifying views regarding imposition of the death penalty. The trial court did not abuse its discretion under Code of Civil Procedure section 223, nor did it violate defendant's constitutional rights. (*People v. Box, supra,* 23 Cal.4th at pp. 1180–1181.)

### D. *Batson/Wheeler Claim*

During jury selection, after the prosecution used its ninth peremptory challenge to excuse B.J., a Black woman, the defense made an objection under *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. The trial court stated that it would hear argument on the objection at the next recess. The prosecution then used its 11th peremptory challenge against N.M., another Black woman. After the prosecutor had exercised 12 peremptory challenges and the defense had exercised 13 peremptory challenges, both sides expressed satisfaction with the jury as constituted, and the jurors were sworn to try the case. Alternate jurors were then selected and sworn.

During the next recess, the defense presented argument on the *Wheeler* objection. Defense counsel stated that the objection was under *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*) as well as *Wheeler* and that "[t]he racial group we are talking about in this instance is African American, specifically African American women." The court asked whether the challenge was "based on the race of the two jurors who were excused." Defense counsel replied that it was based on "race and gender," that the prosecutor had excused two of the three African-American women who were on the jury panel, and that defense counsel believed this was sufficient to raise an inference of impermissible discrimination.

In response, the prosecutor argued that the defense was improperly "interrelating classes" and that the presence of seven women on the jury showed there had been no discrimination against women. The prosecutor also noted that of the four African-Americans on the initial panel, he had challenged two, the defense had challenged one, and one was seated on the jury. Defense counsel responded that, as to gender, the prosecution had used eight of 12 peremptory challenges against women. The trial court stated that "out of an abundance of caution" it was giving the prosecution "the opportunity to offer whatever nongender-based or nonracially based rationale you care to offer for the challenges."

The prosecutor said he challenged N.M. because she "indicated that she thought there was some problems with the district attorney's office handling high-profile cases" and because she "indicated that she had a brother that had been arrested and prosecuted for drugs." The prosecutor said he challenged B.J. because her "son was prosecuted by our office, and she was an alibi witness in that case" and because "she's probably one of the most hostile jurors that I've ever questioned." The prosecutor added: "I think that she feels very, very upset with the prosecution of her son." Defense counsel declined the trial court's invitation to comment on these reasons, stating: "We would submit for the court's ruling on it." The trial court then ruled on this aspect of the challenge, stating: "I think the People—their explanation I think convinces me that the challenges to [B.J.] and [N.M.] were not racially motivated or based upon their race."

The trial court then "out of an abundance of caution" asked the prosecutor to provide reasons for its peremptory challenges against the other six women. The prosecutor asked for time to review his notes and papers, and the court agreed to take up the matter later. The prosecutor noted that the defense had used most of its peremptory challenges against men, possibly as many as 11 out of 13 challenges. The court replied, in substance, that it did not think that was relevant in ruling on the defense challenge: "I'm not sure two wrongs make a right . . . ."

The next day, the prosecutor provided reasons for the remaining six peremptory challenges to women. The prosecutor said he challenged L.J. "because she indicated on five different places on the questionnaire that she was against the death penalty." He challenged J.O. because she "indicated on her questionnaire that she felt she was a wishy-washy person," that she "had difficult[y] making up her mind," that "pressure from other jurors might start her to doubt herself," and that "she thinks she is a bad judge of character." He challenged N.J. because she stated on her questionnaire that "the burden of deciding a person's life was really just too great a decision for her to make." He challenged F.C. because she stated on her questionnaire that she would "find it difficult" to vote for death and the prosecutor thought she had "a clear leaning against the death penalty." He challenged L.H. because "a fair reading of her questionnaire is that she hasn't made up her mind" about the death penalty, and because "a fair reading of her statements in court was that she really is much opposed to the death penalty." He challenged B.B. because she wrote on her questionnaire that "she had religious and philosophical views so that she would always vote against the death penalty" and because he thought she might have difficulty understanding spoken English. Finally, he challenged M.B. because she was 73 years old and appeared to be "basically overwhelmed" and because she had apologized for believing in the death penalty.

After hearing defense counsel's argument in response, the trial court overruled the defense objection, stating: "I'm satisfied that the district attorney has made an explanation for each of these challenges which persuades me that they were not solely or sufficiently based on gender that they should be held to have violated [defendant's] constitutional rights."

Defendant contends that the trial court erred in overruling the *Batson/Wheeler* objection because the prosecutor's reasons for the peremptory challenges "found little or no support in the record" and because the trial court "failed in its duty to seriously evaluate the credibility of the prosecutor's excuses and make a reasoned determination of whether purposeful discrimination existed." Defendant contends that this error violated his rights under the federal Constitution to a fair trial, to due process of law, and to equal protection of the law, and his rights under the state Constitution to trial by a jury drawn from a representative cross-section of the community.

■ The use of peremptory challenges to remove prospective jurors because of their race or gender violates both the federal and the California Constitutions. (*J. E. B. v. Alabama ex rel. T. B.* (1994) 511 U.S. 127, 129 [128 L.Ed.2d 89, 114 S.Ct. 1419]; *Powers v. Ohio* (1991) 499 U.S. 400, 409 [113 L.Ed.2d 411, 111 S.Ct. 1364]; *Batson, supra,* 476 U.S. at p. 89; *People v. McDermott* (2002) 28 Cal.4th 946, 969 [123 Cal.Rptr.2d 654, 51 P.3d 874].) The United States Supreme Court has set out a three-step process to be followed when a party claims that an opponent has improperly discriminated in the exercise of peremptory challenges. First, the complaining party must make out a prima facie case of invidious discrimination. Second, the party exercising the challenge must state nondiscriminatory reasons for the challenge. Third, the trial court must decide whether the complaining party has proved purposeful discrimination. (*Johnson v. California* (2005) 545 U.S. 162 [162 L.Ed.2d 129, 125 S.Ct. 2410, 2416]; *Purkett v. Elem* (1995) 514 U.S. 765, 767 [131 L.Ed.2d 834, 115 S.Ct. 1769]; *People v. Silva* (2001) 25 Cal.4th 345, 384 [106 Cal.Rptr.2d 93, 21 P.3d 769].)

By asking the prosecutor to explain the peremptory challenges, the trial court here implicitly found that defendant had made a prima facie showing of impermissible discrimination in the exercise of peremptory challenges. (*People v. Cash* (2002) 28 Cal.4th 703, 723 [122 Cal.Rptr.2d 545, 50 P.3d 332].) Once the trial court ruled on the credibility of the prosecutor's stated reasons, the issue of whether the defense had made a prima facie showing became moot. (*Hernandez v. New York* (1991) 500 U.S. 352, 359 [114 L.Ed.2d 395, 111 S.Ct. 1859]; *People v. Arias* (1996) 13 Cal.4th 92, 135 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

When a trial court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror, we accord great

deference to its ruling, reviewing it under the substantial evidence standard. (*People v. McDermott, supra,* 28 Cal.4th at p. 971; *People v. Cash, supra,* 28 Cal.4th at p. 725.)

We consider each of the eight challenged jurors, taking them in the order in which the prosecutor provided reasons for the peremptory challenges.

The prosecutor's stated reasons for challenging N.M. were that she "indicated that she thought there was some problems with the district attorney's office handling high-profile cases" and because she "indicated that she had a brother that had been arrested and prosecuted for drugs." These reasons are neutral as to race and gender, they are not inherently implausible, and substantial evidence supports the trial court's finding on the credibility of this explanation. In response to a question on the juror questionnaire asking whether she had "any specific feeling for or against . . . prosecutors (district attorneys)," she marked "yes" and explained: "There seems to be many problems with high-profile cases." In response to another question, she indicated that a close relative or friend had been arrested, charged, and tried for a crime, and she explained: "Brother arrested for possession of drugs."

Defendant argues that the prosecutor's reasons for challenging N.M. are not credible because other jurors whom the prosecutor did not challenge, and who were ultimately seated on the jury, also had relatives who had been arrested for drug-related offenses. Even if we assume we must conduct a comparative juror analysis for the first time on appeal (see *Miller-El v. Dretke* (2005) 545 U.S. 231, fn. 2 [162 L.Ed. 2d 196, 125 S.Ct. 2317, 2326]; *People v. Schmeck* (2005) 37 Cal.4th 240, 270 [33 Cal.Rptr.3d 397, 118 P.3d 451]; *People v. Gray, supra,* 37 Cal.4th at pp. 188–189), defendant does not identify any seated juror who gave responses similar to N.M.'s on both of the topics mentioned by the prosecutor. Although some of the seated jurors had relatives who had been arrested for drug-related offenses, none of these jurors also expressed any feelings against prosecutors.

The prosecutor said he challenged B.J. because her "son was prosecuted by our office, and she was an alibi witness in that case" and because "she's probably one of the most hostile jurors that I've ever questioned." The prosecutor added: "I think that she feels very, very upset with the prosecution of her son." These reasons are neutral as to race and gender, they are not inherently implausible, and substantial evidence supports the trial court's finding on the credibility of this explanation. On voir dire, B.J. said that she had been an alibi witness in her son's trial in San Diego County, that the case was dismissed after two trials resulted in hung juries, and that her experiences with the police in that case "were not very favorable," although she denied having negative feelings toward the prosecutor or the criminal justice system.

When the prosecutor stated that B.J. was "probably one of the most hostile jurors" he had ever questioned, the trial court said, "I recall having that same impression when we were talking to her." Defense counsel did not dispute this characterization of B.J.'s demeanor on voir dire, instead merely submitting the matter.

The prosecutor's stated reason for challenging L.J. was that "she indicated on five different places on the questionnaire that she was against the death penalty." The record supports this statement, which provides a credible and gender-neutral ground for challenge. Skepticism about the death penalty is a permissible basis for a prosecutor's exercise of a peremptory challenge. (*People v. Panah* (2005) 35 Cal.4th 395, 441 [25 Cal.Rptr.3d 672, 107 P.3d 790]; *People v. McDermott, supra,* 28 Cal.4th at pp. 970–971.)

The prosecutor's stated reasons for challenging J.O. were that she "indicated on her questionnaire that she felt she was a wishy-washy person," that she "had difficult[y] making up her mind," that "pressure from other jurors might start her to doubt herself," and that "she thinks she is a bad judge of character." The record supports these reasons, which provide credible and gender-neutral grounds for challenge. A prosecutor could reasonably be concerned about a juror who said she was a bad judge of character because she would "believe any hard luck story."

The prosecutor's stated reason for challenging N.J. was her questionnaire response that "the burden of deciding a person's life was really just too great a decision for her to make." This is an accurate description of one of N.J.'s questionnaire responses, in which she marked the "no" response to a question asking whether she would like to serve as a juror on this case, adding this explanation: "The burden of decision for a person's life-either the death sentence or life imprisonment." This response provides a legitimate and credible reason for the challenge.

The prosecutor said he challenged F.C. because she stated on her questionnaire that she would "find it difficult" to vote for death and the prosecutor thought she had "a clear leaning against the death penalty." In response to a question asking for her "feelings about the death penalty," F.C. wrote on her questionnaire, "In a few cases it may be necessary, but in general I would find it difficult to give this recommendation." These reservations about the death penalty provided a permissible basis for a prosecutor's exercise of a peremptory challenge. (*People v. Panah, supra,* 35 Cal.4th at p. 441; *People v. McDermott, supra,* 28 Cal.4th at pp. 970–971.)

The prosecutor said he challenged L.H. because "a fair reading of her questionnaire is that she hasn't made up her mind" about the death penalty,

and because "a fair reading of her statements in court was that she really is much opposed to the death penalty." In response to the question asking for her "feelings about the death penalty," L.H. wrote this response: "Well, it seems that killing a person by the death penalty for killing someone else is confusing. What will sentencing someone to die do for our society? I'm not sure of this 'eye for an eye' sentence." In response to a question asking what purpose or purposes the death penalty serves, she wrote: "I'm not sure it does serve a valid purpose. Unfortunately, it seems to be disproportionately given to non-whites. Also, there's no going back once it's done—what if new evidence comes to light?" Her responses on voir dire also revealed skepticism about the death penalty. These reservations about the death penalty provided a legitimate, credible, gender-neutral basis for a prosecutor's exercise of a peremptory challenge.

He challenged B.B. because she wrote on her questionnaire that "she had religious and philosophical views so that she would always vote against the death penalty" and because he thought she might have difficulty understanding spoken English. The record supports these reasons. The questionnaire asked the prospective jurors whether they had "any moral, religious, or philosophical opposition to the death penalty so strong that [they] would be unable to impose the death penalty regardless of the facts." In response to this question, B.B. put a check mark next to "yes," with this explanation: "Thou shalt not kill, one of the 10 commandments of God." She also indicated that she had been born in the Philippines, thereby suggesting that English might not be her first language. These are permissible, neutral, and credible reasons for the peremptory challenge of B.B.

Finally, the prosecutor said he challenged M.B. because she was 73 years old and appeared to be "basically overwhelmed" and because she had apologized for believing in the death penalty. The record supports these reasons, which are credible and gender neutral. The questionnaire asked the prospective jurors to state their "feeling about the death penalty." M.B. wrote in response: "I am sorry to say but I am for the death penalty." She also indicated on the questionnaire that she would not like to serve as a juror on this case. On voir dire, when the prosecutor asked her about this response, she said: "I have served on juries before and I also been on election boards, I think somebody else should do it. You know, my years living."

▪ We are unpersuaded by defendant's argument that the trial court erred in deferring argument on defendant's *Batson/Wheeler* motion until the next recess, which occurred after the jury selection process had been completed and a jury had been sworn to try the case. Defense counsel did not object to this procedure at the time, and in fact indicated that the defense was satisfied with the jury that was sworn to try the case. Moreover, the swearing of the

jury would not have made it impossible for the trial court to grant effective relief in the event the court granted the *Batson/Wheeler* motion. Although jeopardy attached with the swearing of the jury, a *Batson/Wheeler* motion may be deemed a motion for mistrial and thus a waiver of any double jeopardy defense. (See *People v. Batts* (2003) 30 Cal.4th 660, 679 [134 Cal.Rptr.2d 67, 68 P.3d 357] [a defendant's request for a mistrial waives any double jeopardy claim]; see also *People v. Yeoman* (2003) 31 Cal.4th 93, 115 [2 Cal.Rptr.3d 186, 72 P.3d 1166] [*Wheeler* motions often termed motions for mistrial].)

We conclude that substantial evidence supports the trial court's rulings rejecting defendant's *Batson/Wheeler* challenges on the basis of race and gender.

### III. Issues Relating to Guilt and Special Circumstances

#### A. *Conditional Examination Testimony*

Defendant contends that the trial court erred under state law in overruling his objection to admission at trial of the conditional examination testimony of Brian Johnsen, and that this error violated defendant's constitutional rights to due process, to counsel, to confrontation, and to fair and reliable determinations of guilt and penalty under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

##### 1. *Factual background*

On November 1, 1991, the trial court granted the prosecutor's request under section 1054.7 for an in camera hearing out of the presence of defendant and his attorney to consider postponement or limitation of discovery. At the hearing, the prosecutor told the court that in September 1991, during an interview with a prosecution investigator, Brian Johnsen had said that defendant had killed Holloway to prevent her from revealing a plan to kill a man named Doug Mynatt, who was believed to have ties to the Hell's Angels and whose whereabouts was unknown. The prosecutor expressed concern that disclosure of this information to the defense through the discovery process could endanger Mynatt's life or cause Mynatt to become a threat to the lives of Johnsen and Anna Humiston, who was not then in custody. The prosecutor also stated his intention to secure Johnsen's testimony by conditional examination. The trial court granted the prosecutor a one-week extension of the deadline for disclosure of the information obtained during the September interview of Johnsen.

At a hearing on November 8, 1991, the prosecutor gave the defense an investigator's report of the September interview of Brian Johnsen, and the

prosecutor submitted a written motion for a conditional examination of Johnsen on the ground that his life was in jeopardy (§ 1336, subd. (b)). Defendant's attorney asked for more time to study the report and the motion, but the trial court granted the motion for conditional examination. The court observed, however, that under section 1341, if the magistrate was convinced, on the date set for the conditional examination, that Johnsen's life was not in jeopardy, then the conditional examination would not take place.

The conditional examination of Brian Johnsen, which was recorded on videotape, began on November 15, continued on November 18, and concluded on November 19, 1991. Thereafter, on July 6, 1992, the prosecutor announced that he was seeking the death penalty against defendant, in part because of the evidence disclosed at the conditional examination. On September 10, 1993, the defense filed a motion to exclude the conditional examination at trial, primarily on the ground that conditional examinations are not permitted in capital cases. After receiving opposition to the motion from the prosecution, and holding a hearing, the trial court denied the motion on October 29, 1993.

Defendant petitioned the Court of Appeal for a writ of mandate barring use of the conditional examination at trial. The Court of Appeal denied the petition in an unpublished opinion on December 2, 1993. This court granted defendant's petition for review of the Court of Appeal's decision and transferred the matter back to the Court of Appeal to reconsider in light of *People v. Municipal Court* (*Ahnemann*) (1974) 12 Cal.3d 658 [117 Cal.Rptr. 20, 527 P.2d 372] (stating that mandate is unavailable to resolve an issue as to the admissibility of evidence). After reconsideration, the Court of Appeal again denied the mandate petition, this time citing *Ahnemann*.

On March 22, 1994, defendant filed a motion asking the trial court to reconsider his motion to exclude the conditional examination on the ground that the controlling law had been clarified by the Court of Appeal's decision in *Dalton v. Superior Court* (1993) 19 Cal.App.4th 1506 [24 Cal.Rptr.2d 248] (holding that in a capital case the prosecution could not conditionally examine a witness whose life was in jeopardy). The trial court agreed to reconsider its ruling, but after reconsideration it again denied the motion to exclude the conditional examination.

Defendant sought appellate review of this ruling by again petitioning the Court of Appeal for a writ of mandate. The Court of Appeal summarily denied the petition, and this court denied defendant's petition for review.

At trial, the parties stipulated to Brian Johnsen's unavailability as a witness. Over defendant's continuing objection, the videotape of the conditional examination was played for the jury. In his conditional examination

testimony, Johnsen described how he and Teresa Holloway had become acquainted with defendant, Denise Shigemura, Anna Humiston, and Doug Mynatt, and how their relationships had developed. His testimony provided the only evidence of the telephone conversations in which the plan to kill Mynatt was discussed and concern was expressed that Holloway not be told about the plan for fear she would disclose it. His testimony also described a telephone conversation after Holloway's murder in which Johnsen asked defendant why he had killed Holloway and defendant had replied that it had to be done.

### 2. *Conditional examinations in capital cases*

Defendant contends that conditional examinations are not permitted in capital cases. He relies on section 1335, subdivision (a), which provides: "When a defendant has been charged with a public offense triable in any court, he or she in all cases, and *the people in cases other than those for which the punishment may be death*, may, if the defendant has been fully informed of his or her right to counsel as provided by law, have witnesses examined conditionally in his or her or their behalf, as prescribed in this chapter." (Italics added.) Defendant argues that this provision bars the prosecution from conditionally examining any of its witnesses in a capital case. In ruling the conditional examination admissible, however, the trial court relied on former subdivision (b) of the same section, which at the time of defendant's trial provided: "When a defendant has been charged with a serious felony, the people may, if the defendant has been fully informed of his or her right to counsel as provided by law, have a witness examined conditionally as prescribed in this chapter if the people have evidence that the life of the witness is in jeopardy." (§ 1335, former subd. (b), as amended by Stats. 1985, ch. 783, § 2, p. 2525.)[5]

On first reading, subdivision (a) and former subdivision (b) of section 1335 appear inconsistent. Subdivision (a) appears to generally prohibit the prosecution from conditionally examining witnesses in cases "for which the punishment may be death," whereas former subdivision (b) appears to allow the prosecution to conditionally examine a witness whose life is in jeopardy in any case in which the defendant is charged with a serious felony.

 To resolve this apparent inconsistency, we view the provisions in their statutory context as part of an overall statutory scheme for conditional

---

[5] The Legislature has since amended this subdivision to also allow a defendant to take a conditional examination of a witness whose life is in danger. (Stats. 2005, ch. 305, § 1.) It now reads: "When a defendant has been charged with a serious felony, the people or the defendant may, if the defendant has been fully informed of his or her right to counsel as provided by law, have a witness examined conditionally as prescribed in this chapter, if there is evidence that the life of the witness is in jeopardy." (§ 1335, subd. (b).)

examinations in criminal cases, seeking to harmonize the provisions in light of the apparent legislative purpose. (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 901 [135 Cal.Rptr.2d 30, 69 P.3d 951]; *People v. Acosta* (2002) 29 Cal.4th 105, 112 [124 Cal.Rptr.2d 435, 52 P.3d 624]; *People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129].)

■ The statutory scheme for conditional examinations includes section 1336. At the time of defendant's trial, former subdivision (a) of that section provided: "When a material witness for the defendant, or for the people, is about to leave the state, or is so sick or infirm as to afford reasonable grounds for apprehension that he or she will be unable to attend the trial, the defendant or the people may apply for an order that the witness be examined conditionally." (Stats. 1985, ch. 783, § 3, p. 2525.) Subdivision (b) of section 1336 provided: "When the people have evidence that the life of a prosecution witness is in jeopardy, the people may apply for an order that the witness be examined conditionally." (Stats. 1985, ch. 783, § 3, p. 2525.)[6]

Reading sections 1335 and 1336 together, it appears that the Legislature may have intended to prohibit the prosecution in a capital case from taking a conditional examination of a witness for any of the reasons stated in subdivision (a) of section 1336—illness, dependency, age, or impending departure from the state—but to permit the prosecution in a capital case to conditionally examine a witness whose life is in jeopardy. This reading would resolve the apparent inconsistency between subdivision (a) and former subdivision (b) of section 1335 and harmonize those provisions with section 1336.

Arguing against this construction, defendant relies on *Dalton v. Superior Court, supra,* 19 Cal.App.4th 1506. The Court of Appeal there expressed the view that allowing the prosecution to conditionally examine a witness in a death penalty case only when the witness's life was in jeopardy "would create a distinction in the use of preserved testimony which seemingly would have no justification" in that "the testimony of a witness who is to die before the death penalty trial because of natural causes could not be preserved, while that same witness's testimony could be preserved if the threat of nonattendance at trial

---

[6] Since defendant's trial, the Legislature has amended section 1336 to include witnesses 65 years of age or older and dependent adults, and to authorize the defendant, as well as the prosecution, to take a conditional examination under subdivision (b). (Stats. 2005, ch. 305, § 2.) Those subdivisions now read: "(a) When a material witness for the defendant, or for the people, is about to leave the state, or is so sick or infirm as to afford reasonable grounds for apprehension that he or she will be unable to attend the trial, or is a person 65 years of age or older, or a dependent adult, the defendant or the people may apply for an order that the witness be examined conditionally. [¶] (b) When there is evidence that the life of a witness is in jeopardy, the defendant or the people may apply for an order that the witness be examined conditionally." (§ 1336, subds. (a)–(b).)

were based upon possible kidnap or murder." (*Dalton, supra,* at p. 1512.) We do not view this distinction as irrational, however. When a prosecution witness may die before trial from natural causes, the prosecution risks the loss of important evidence. This same interest is at stake when the witness's life is in jeopardy from criminal violence, but there is in addition the strong public interest in deterring criminal conduct in the form of an actual or attempted murder of the witness. Recognizing the presence of this additional interest, the Legislature could reasonably decide to authorize prosecutorial conditional examinations in capital cases when the witness's life is in jeopardy from criminal violence, to remove the incentive a capitally charged defendant or his or her allies might otherwise have to murder prosecution witnesses to prevent them from testifying.

This construction is also consistent with the history of conditional examinations in criminal cases in California. As enacted in 1879, the California Constitution granted the Legislature power to authorize prosecutorial conditional examinations "in criminal cases, other than cases of homicide." (Cal. Const., former art. 1, § 13, repealed Nov. 5, 1974.) In 1905, the Legislature exercised this constitutionally granted authority by providing, in section 1335, for conditional examinations of prosecution witnesses in cases "other than homicide." (Stats. 1905, ch. 540, § 1, p. 702.) In 1951, section 1335 was amended to permit conditional examinations of prosecution witnesses in cases other than "those for which the punishment may be death." (Stats. 1951, ch. 96, § 1, p. 354.) In 1974, the state Constitution was amended to remove the prohibition on conditional examinations in capital cases. The relevant provision now reads: "The Legislature may provide for the deposition of a witness in the presence of the defendant and the defendant's counsel." (Cal. Const., art. 1, § 15, cl. 4.) In 1985, the Legislature amended section 1335 to permit the prosecution to take a conditional examination when the defendant has been charged with a serious felony and there is evidence the witness's life is in jeopardy. (Stats. 1985, ch. 783, § 2, p. 2525.) We infer that, after the 1974 constitutional amendment removed the blanket prohibition on conditional examinations by the prosecution in capital cases, the Legislature used its new authority in 1985 to authorize the prosecution to take conditional examinations in capital cases in the limited situation where the witness's life is threatened.

The 1985 amendment of sections 1335 and 1336 was included in Assembly Bill No. 2059 (1985–1986 Reg. Sess.), which also added section 1350 to the Evidence Code. That provision establishes an exception to the hearsay rule for a statement by an unavailable declarant when, among other things, "[t]here is clear and convincing evidence that the declarant's unavailability was knowingly caused by, aided by, or solicited by the party against whom the statement is offered for the purpose of preventing the arrest or prosecution of the party and is the result of the death by homicide or the kidnapping of the declarant." (Evid. Code, § 1350, subd. (a)(1).) Like the "life in jeopardy"

provision for conditional examinations (§ 1335, subd. (b)), the hearsay exception of Evidence Code section 1350 applies in criminal proceedings in which a serious felony is charged (*id.,* subd. (a)), and "serious felony" is defined to include felonies listed in subdivision (c) of section 1192.7. (Compare Evid. Code, § 1350, subd. (d), with Pen. Code, § 1335, subd. (c).) Those listed felonies include "any felony punishable by death . . . ." (§ 1192.7, subd. (c)(7).) Because they were packaged together, it is reasonable to infer that the adoption of the hearsay exception in Evidence Code section 1350 and the amendment of the conditional examination provisions of Penal Code sections 1335 and 1336 address a common problem and result from a common legislative concern—criminal violence against prospective prosecution witnesses to prevent their testimony. The risk that this will occur likely increases in proportion to the potential punishment for the charged offense, and thus it is greatest in capital cases. Absent language expressly barring application of these provisions to capital cases, therefore, it is reasonable to infer that the Legislature intended to permit the prosecution to conditionally examine witnesses in capital cases when there is evidence that their lives are in serious danger.

█ We conclude, therefore, that under subdivision (b) of section 1335, conditional examination of a prosecution witness is permitted in a capital case when the witness's life is in jeopardy.[7]

### 3. *Required showing for conditional examination*

Defendant argues, next, that the prosecution should not have been allowed to conditionally examine Brian Johnsen because there was no evidence that his life was in jeopardy.

█ Section 1335, subdivision (b), permits the prosecution to conditionally examine a witness "if there is *evidence* that the life of the witness is in jeopardy." (Italics added.) Section 1336, subdivision (b), similarly requires the prosecution to produce evidence to support a claim that a witness's life is in jeopardy. Section 1337 provides that an application for conditional examination "shall be made upon affidavit stating" among other things "that the life of the witness is in jeopardy." Section 1338 requires that the application be made on "three days' notice to the opposite party," and section 1339 provides that "[i]f the court or judge is satisfied that the examination of the witness is necessary, an order must be made that the witness be examined conditionally, at a specified time and place, and before a magistrate designated therein."

Here, the prosecution's application to conditionally examine Brian Johnsen was supported by evidence in the form of a declaration of Deputy District

---

[7] *Dalton v. Superior Court, supra,* 19 Cal.App.4th 1506, is disapproved.

Attorney Pettine stating, in relevant part: "I am informed that witness Brian Johnsen was directly involved with defendants Shigemura and Jurado in a plot to kill Doug Mynatt. According to Mr. Johnsen, the defendants, acting on their own and without the knowledge of Mr. Johnsen, killed victim Teresa Holloway so that she would not disclose the plan to murder Mr. Mynatt. Mr. Mynatt's current whereabouts is unknown. Mr. Johnsen, who was in custody on the date of the Holloway murder, is currently out of custody. [¶] Declarant believes that once this information becomes known, witness Brian Johnsen's life will be jeopardized by Mr. Mynatt, the defendants, and/or their associates."

The trial court granted the application without allowing the defense the three days' notice specified in section 1338, but the court said that under section 1341 the conditional examination would not take place if, on the day set for the conditional examination, the defense was able to show to the magistrate's satisfaction that Johnsen's life was not in danger.[8] The conditional examination began a week later. Before it began, defendant offered no evidence that Johnsen's life was not in danger.

The prosecution satisfied the requirements of sections 1335, 1336, and 1337 by submitting a declaration stating that Johnsen's life was in danger from Doug Mynatt, defendant and his codefendants, and their associates. In granting the prosecutor's application for a conditional examination, the trial court did not abuse the broad discretion with which the statutory scheme vested it. In particular, it was not necessary, under the circumstances of this case, for the prosecution to present evidence that anyone had expressly threatened Johnsen or conspired to harm him. Because of the evidence that defendant, Shigemura, and Humiston had killed Holloway to prevent her from exposing a plot to kill Mynatt, the trial court—who both granted the application for conditional examination and served as magistrate in the taking of the examination—could justifiably conclude that defendant and the persons with whom he associated would be likely to use deadly force against anyone perceived as a threat, and that the substance of Johnsen's proposed testimony made him an actual or potential threat to defendant and his codefendants, and also to Mynatt.

Although defendant did not receive the three days' notice to which section 1338 entitled him, he was not prejudiced by the shortened notice because seven days elapsed before the conditional examination began during which,

---

[8] In full, at the time of defendant's trial, former section 1341 read: "If, at the time and place so designated, it is shown to the satisfaction of the magistrate that the witness is not about to leave the state, or is not sick or infirm, or that the life of the witness is not in jeopardy, or that the application was made to avoid the examination of the witness on the trial, the examination cannot take place." (Stats. 1985, ch. 783, § 5, p. 2525.) Since defendant's trial, section 1341 has been amended to include witnesses 65 years of age or older and dependent adults. (Stats. 2005, ch. 305, § 4.)

under section 1341, defendant could have presented evidence to contradict the prosecutor's declaration that Brian Johnsen's life was in danger. We conclude that defendant has failed to show that any prejudicial error occurred in the taking of Brian Johnsen's conditional examination.

### 4. *Admission of conditional examination at trial*

The prosecutor argued below, and the Attorney General argues in this court, that even if the prosecution is prohibited from taking conditional examinations in capital cases, that prohibition did not apply here because the prosecutor had not yet decided to seek the death penalty, and indeed had announced the death penalty would not be sought, when the trial court granted the prosecution's application for a conditional examination and when Brian Johnsen was conditionally examined. In response to this argument, defendant argues that even if it was proper to conditionally examine Johnsen because the prosecutor was not then seeking the death penalty, it was error to admit Johnsen's conditional examination in evidence at defendant's capital trial. Because we have concluded that the prosecution in a capital case may conditionally examine a witness whose life is in jeopardy, we need not address this issue.

Defendant also argues that admission of Brian Johnsen's conditional examination in evidence at trial denied him his rights under the federal Constitution to due process, confrontation of adverse witnesses, and reliable guilt and penalty determinations in a capital case. But Johnsen testified under oath at the conditional examination, and defendant had a full and fair opportunity to cross-examine him at that time. For purposes of due process, confrontation, and reliability, the situation is no different than if Johnsen or any other witness had testified at the preliminary hearing or at an earlier trial and then, because he had become unavailable, his prior testimony was admitted at trial. When a defendant has had an adequate opportunity for cross-examination and the witness is unavailable at trial, use of prior testimony does not violate the defendant's rights under the federal Constitution. (*People v. Wilson* (2005) 36 Cal.4th 309, 343 [30 Cal.Rptr.3d 513, 114 P.3d 758]; see *Crawford v. Washington* (2004) 541 U.S. 36, 55–57 [158 L.Ed.2d 177, 124 S.Ct. 1354].)

Defendant asserts that he did not have an adequate opportunity to cross-examine Brian Johnsen at the conditional examination because his attorneys later acquired additional information that would have been useful in cross-examining Johnsen. In particular, he calls our attention to the statements that

Johnsen later made, after he had been charged with capital murder,[9] admitting that he was aware of and agreed with defendant's plan to kill Holloway. Again, however, the situation is no different than if Johnsen had testified at defendant's preliminary hearing or at a prior trial of defendant on the same charges. Absent wrongful failure to timely disclose by the prosecution, a defendant's subsequent discovery of material that might have proved useful in cross-examination is not grounds for excluding otherwise admissible prior testimony at trial. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 851 [64 Cal.Rptr.2d 400, 938 P.2d 2] [admission of prior testimony does not violate the right of confrontation "regardless whether subsequent circumstances bring into question the accuracy or the completeness of the earlier testimony."].)

### B. *Shigemura's Out-of-court Statement*

Defendant contends that the trial court erred in overruling defense hearsay objections to the testimony of Steven Baldwin relating out-of-court statements by Denise Shigemura. Baldwin testified that on the day after Holloway's murder, defendant and Shigemura came to his house with Mark Schmidt. As the four of them sat together in the living room, Shigemura said to Baldwin: "I no longer need what it was I asked you for. We took care of the problem and we dumped the body at Balboa Park." Baldwin testified that he thought Shigemura was referring to a conversation a few days earlier during which she had asked him if he could get her a "gat" because she had a problem she needed to take care of. The trial court admitted this evidence under the adoptive admissions exception to the hearsay rule.

"Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.) When a defendant remains silent after a statement alleging the defendant's participation in a crime, under circumstances that fairly afford the defendant an opportunity to hear, understand, and reply, the statement is admissible as an adoptive admission, unless the circumstances support an inference that the defendant was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution. (*People v. Riel* (2000) 22 Cal.4th 1153, 1189 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *People v. Mayfield* (1997) 14 Cal.4th 668, 741 [60 Cal.Rptr.2d 1, 928 P.2d 485].)

Denise Shigemura's out-of-court statement—"We took care of the problem and we dumped the body at Balboa Park"—was admissible as an adoptive

---

[9] Brian Johnsen was sentenced to death on June 9, 1994, for crimes committed in Stanislaus County.

admission by defendant. He must have heard and understood the statement because he was sitting on the same couch with Shigemura, the circumstances called for a denial or protest if the statement was inaccurate, nothing prevented him from making a response, and nothing supports an inference that he was relying on a constitutional right of silence. In this situation, the jury could properly view defendant's silence as adopting Shigemura's statement.

Defendant claims that admission of this evidence violated his right of confrontation under the Sixth Amendment to the federal Constitution. He did not, however, make a specific objection on constitutional grounds at trial. Assuming without deciding that the issue is preserved for appellate review (see *People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6 [39 Cal.Rptr.2d 547, 891 P.2d 93]; see also *People v. Partida* (2005) 37 Cal.4th 428 [35 Cal.Rptr.3d 644, 122 P.3d 765]), the claim is without merit. The right of confrontation is not violated when the jury hears evidence, from a witness subject to cross-examination, relating a defendant's own out-of-court statements and adoptive admissions. (*People v. Roldan* (2005) 35 Cal.4th 646, 711, fn. 25 [27 Cal.Rptr.3d 360, 110 P.3d 289]; *People v. Combs* (2004) 34 Cal.4th 821, 842–843 [22 Cal.Rptr.3d 61, 101 P.3d 1007].)

██ As defendant points out, he was not present a few days before when Shigemura asked Baldwin for a "gat" and said she needed it to take care of a problem, so this earlier statement was not admissible as an adoptive admission. The request for the gun, by itself, was not hearsay, however, because an out-of-court statement is hearsay only when it is "offered to prove the truth of the matter stated." (Evid. Code, § 1200.) Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated. (See *People v. Mayfield, supra,* 14 Cal.4th at p. 741 [pleas for help "were not hearsay because they were not admitted for the truth of the matter stated"]; *People v. Bolden* (1996) 44 Cal.App.4th 707, 714–715 [52 Cal.Rptr.2d 485] [request that defendant "not come around the house anymore" was not hearsay because it was not offered for the truth of the matter stated]; *People v. Reyes* (1976) 62 Cal.App.3d 53, 67 [132 Cal.Rptr. 848] ["words of direction or authorization do not constitute hearsay since they are not offered to prove the truth of any matter asserted by such words"].) Thus, Shigemura's request for a gun was not hearsay.

Shigemura's earlier out-of-court statement to Baldwin was hearsay insofar as it asserted that Shigemura had a problem that she needed to take care of. The Attorney General argues that it was admissible under the coconspirator exception to the hearsay rule (Evid. Code, § 1223) because it was made to further a conspiracy between defendant, Shigemura, and Brian Johnsen to kill Doug Mynatt. There was no substantial evidence at trial, however, that these

three individuals reached any agreement to kill Doug Mynatt until the evening of May 15, 1991, shortly before Holloway's murder, whereas Shigemura's statement to Baldwin occurred a day or two earlier. Accordingly, this statement was not admissible under the coconspirator exception to the hearsay rule, and the trial court erred in not excluding it.

Even if we assume this error violated defendant's right of confrontation under the federal Constitution, reversal is not required because defendant suffered no prejudice. Shigemura repeated the substance of the earlier hearsay statement (that she had a problem she needed to take care of) in defendant's presence ("We took care of the problem and we dumped the body at Balboa Park") and defendant by his conduct adopted that statement as his own. We conclude the error was harmless beyond a reasonable doubt.

### C. *Sufficiency of the Evidence*

Defendant contends that the evidence presented at the guilt phase was insufficient to establish the premeditation element of first degree murder, the lying-in-wait special circumstance, and the conspiracy conviction, and he asserts that basing a conviction or special circumstance finding on insufficient evidence violates his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution to due process of law, a fair trial, and reliable verdicts in a capital case.

"To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128 [113 Cal.Rptr.2d 27, 33 P.3d 450]; accord, *People v. Silva, supra,* 25 Cal.4th at p. 368.)

A murder that is premeditated and deliberate is murder of the first degree. (§ 189.) "In this context, 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " (*People v. Mayfield, supra,* 14 Cal.4th at p. 767.) "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely, supra,* 35 Cal.4th at p. 543.) A reviewing court normally considers three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but "[t]hese factors need not be present in any particular combination to find substantial evidence of

premeditation and deliberation." (*Ibid.*; see also *People v. Combs, supra,* 34 Cal.4th at p. 850; *People v. Silva, supra,* 25 Cal.4th at p. 368.)

The evidence of preexisting motive was ample. During the days before Holloway's murder, defendant had talked to Brian Johnsen and Denise Shigemura about whether they should kill Doug Mynatt, but they had decided not to tell Teresa Holloway about this because of concern that she would reveal it to the police. On the night of the murder, defendant told Johnsen that he had decided to proceed with the plan to kill Mynatt and that it could not wait until Johnsen was released from jail. Teresa Holloway then got on the phone and asked Johnsen whether there was a plan to kill Mynatt. From this evidence, a rational juror could infer that defendant had a motive to kill Holloway, to prevent her from revealing his planned killing of Mynatt.

The evidence of planning activity was ample as well. Shortly before the murder, defendant asked Mark Schmidt for a chain. When Schmidt offered defendant an 18-inch length of plastic weed-eater cord, defendant wrapped the cord around his own neck, with one end in each fist clenched at shoulder height, and said: "It will do." From these actions, a rational juror could infer that defendant had already decided to use the cord to strangle Holloway. Defendant then asked Schmidt to tell Teresa Holloway to get off the phone because he (Schmidt) needed to leave the apartment. A rational juror could infer that defendant made this request so that Holloway would be forced to leave Schmidt's apartment and then could be lured into Anna Humiston's car, where the fatal attack would take place. In the car, defendant positioned himself directly behind Holloway. A rational juror could infer that defendant did so to facilitate his planned strangulation of Holloway.

Because this evidence of preexisting motive and planning activity was by itself sufficient to support the first degree murder conviction on a theory of premeditation and deliberation, we need not review the evidence concerning the manner of killing.

The lying-in-wait special circumstance requires proof of "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." (*People v. Morales* (1989) 48 Cal.3d 527, 557 [257 Cal.Rptr. 64, 770 P.2d 244]; accord, *People v. Combs, supra,* 34 Cal.4th at p. 853; *People v. Michaels, supra,* 28 Cal.4th at p. 516.)

There is sufficient evidence that defendant concealed from Holloway his purpose to kill her. As explained earlier, there is substantial evidence from which a rational juror could infer that defendant had already formed this

purpose when he obtained a cord from Mark Schmidt that could be used to strangle Holloway. He did not reveal that purpose to Holloway immediately by attacking her, but instead lured her into Humiston's car.

There is sufficient evidence of a substantial period of watching and waiting for an opportune time to act. The place where Teresa Holloway's body was found was two to three miles from Mark Schmidt's apartment. A rational juror could infer that defendant did not attack Holloway immediately after luring her into Humiston's car, but instead waited for a substantial period while the car was driven to a location where there was little risk that the attack would be observed by other motorists or by pedestrians.

Finally, there is substantial evidence that once the car reached a suitable location, defendant immediately launched a surprise attack on an unsuspecting victim from a position of advantage. Defendant ensured a position of advantage by occupying the backseat of Humiston's car, directly behind Teresa Holloway. From the blood evidence found in the car, the very nature of the planned attack, and the lack of injury to defendant, Humiston, or Shigemura, a rational juror could infer that Holloway was taken by surprise, with little or no opportunity to escape or fight back.

In concluding that the evidence is sufficient to support the lying-in-wait special circumstance, we are guided by this court's decisions in *People v. Combs, supra,* 34 Cal.4th 821, and *People v. Morales, supra,* 48 Cal.3d 527, which involved nearly identical facts. In *Combs* and *Morales,* as here, the defendant armed himself with a weapon suitable for use in strangulation, lured an unsuspecting victim into the front seat of an automobile, positioned himself directly behind the victim, waited until the car reached a suitable location, and then launched a surprise attack on the unsuspecting victim. (*People v. Combs, supra,* at p. 853; *People v. Morales, supra,* at p. 554.) In *Morales,* as here, the defendant bludgeoned the victim to death after an initial attempt at strangulation was unsuccessful. (*People v. Morales, supra,* at p. 554.)

We consider next defendant's challenge to the sufficiency of the evidence to support the conspiracy conviction.

██ "A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416 [84 Cal.Rptr.2d 665, 975 P.2d 1071]; accord, *People v. Russo* (2001) 25 Cal.4th 1124, 1131 [108 Cal.Rptr.2d 436, 25 P.3d 641].) "Disagreement as to who the coconspirators were or who did an

overt act, or exactly what that act was, does not invalidate a conspiracy conviction, as long as a unanimous jury is convinced beyond a reasonable doubt that a conspirator did commit some overt act in furtherance of the conspiracy." (*People v. Russo, supra,* at p. 1135.)

Here, defendant's plan to attack and kill Teresa Holloway in Anna Humiston's car required the cooperation of Humiston and Denise Shigemura. There is ample evidence that one or both of them did agree or conspire to commit the murder. Shigemura shared defendant's motive to kill Holloway, because she also had been part of the plot to kill Doug Mynatt and, like defendant, would be put at risk if Holloway revealed that plot. Although there is no direct evidence that defendant and Shigemura discussed in advance the killing of Holloway, there was evidence that they were alone together at Mark Schmidt's residence shortly before the killing, during which a discussion and agreement could have taken place. Shigemura's later conduct provided additional evidence that she agreed to the murder. She was driving Humiston's car at the time of the fatal attack, she did not separate herself from defendant or report the killing afterward, and with defendant's help she concocted a false story to explain why, on the night of Holloway's murder, she failed to return to the halfway house where she was then required to live. As for Humiston, there was evidence that defendant engaged in an intense conversation with her at Schmidt's residence, that she allowed Shigemura to drive her car, and that she did not report the murder afterward and continued to associate with defendant. From this evidence, a rational juror could conclude beyond a reasonable doubt that defendant and either Shigemura or Humiston (or both) had the specific intent to agree or conspire to murder Holloway, as well as the specific intent to commit the elements of murder.

The overt act requirement was also satisfied. The prosecution alleged five overt acts in support of the conspiracy charge. Two alleged overt acts occurred before Holloway's murder (defendant, Denise Shigemura, and Anna Humiston met with Teresa Holloway at Mark Schmidt's residence and defendant, Shigemura, Humiston, and Holloway left Schmidt's residence in Humiston's car); two alleged acts occurred after the murder (defendant, Shigemura, and Humiston placed Holloway's body in the culvert and walked to a nearby phone from which defendant called to request a ride); and one alleged act was the murder itself. The jury returned "not true" findings on the preoffense overt acts allegations, but it found each of the other overt act allegations to be true.

Commission of the target offense in furtherance of the conspiracy satisfies the overt act requirement. (*People v. Padilla* (1995) 11 Cal.4th 891, 966 [47 Cal.Rptr.2d 426, 906 P.2d 388].) Because the jury found that defendant committed the murder itself in furtherance of the conspiracy, and because

substantial evidence supports that finding, the overt act requirement is satisfied. Although defendant is correct that the overt act requirement may not be satisfied by conduct occurring after the target offense is complete (*People v. Zamora* (1976) 18 Cal.3d 538, 560 [134 Cal.Rptr. 784, 557 P.2d 75]), defendant was not prejudiced by the jury's consideration of the invalid postoffense overt act allegations, and the valid finding of a single overt act is sufficient to support the conspiracy verdict. (*People v. Padilla, supra,* at pp. 965–966.)

Defendant argues that the jury's "not true" findings on the preoffense overt act allegations conclusively demonstrate the jury's rejection of the prosecution's theory that defendant had agreed with Shigemura or Humiston (or both) to kill Holloway before Holloway was lured into Humiston's car, and that this inconsistency fatally undermines the conspiracy verdict. We disagree. An inconsistency between a "not true" finding on an overt act and a verdict or another finding is not a ground for overturning the inconsistent verdict or finding. (*People v. Hernandez* (2003) 30 Cal.4th 835, 862 [134 Cal.Rptr.2d 602, 69 P.3d 446]; see *People v. Santamaria* (1994) 8 Cal.4th 903, 911 [35 Cal.Rptr.2d 624, 884 P.2d 81] [recognizing that an apparently inconsistent not true finding may be the result of mistake, compromise, or lenity].)

### D. *Instructions on Conspiracy*

Defendant contends that the trial court's instructions to the jury defining the charged offense of conspiracy omitted part of the specific intent element of that crime and that, during jury deliberations, the trial court erred in failing to dispel the jurors' confusion about the overt act element of conspiracy. He further contends that these errors denied him his rights under the federal Constitution to due process, to proof of each element beyond a reasonable doubt, to a fair and impartial jury trial, and to reliable factfinding in a capital case.

The trial court instructed the jury with two modified versions—one spoken, one written—of CALJIC No. 6.10 defining the crime of conspiracy. As here relevant, the spoken version stated: "A conspiracy is an agreement entered into between two or more persons with the *specific intent to commit* a crime, in this case alleged to be the crime of murder, the murder of Teresa Holloway, followed by an overt act committed by one or more of the parties for the purpose of accomplishing the object of the agreement." (Italics added.) As here relevant, the written version stated: "A conspiracy is an agreement entered into between two or more persons with the *specific intent to agree to commit* the public offense of murder, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement." (Italics added.) The written version was given to the jury for its use during deliberations.

As this court has explained, the crime of conspiracy requires dual specific intents: a specific intent to agree to commit the target offense, and a specific intent to commit that offense. (*People v. Russo, supra,* 25 Cal.4th at p. 1131; *People v. Swain* (1996) 12 Cal.4th 593, 600 [49 Cal.Rptr.2d 390, 909 P.2d 994].) We have cautioned trial courts not to modify CALJIC No. 6.10 to eliminate either of these specific intents. (*People v. Marks* (1988) 45 Cal.3d 1335, 1345 [248 Cal.Rptr. 874, 756 P.2d 260].)

▉ Here, neither of the modified versions of the standard instruction expressly mentioned both of the required specific intents. The written instruction mentioned only the specific intent to agree, while the spoken instruction mentioned only the specific intent to commit the target offense of murder. As defendant points out, when the jury has received an instruction in both spoken and written forms, and the two versions vary, we assume the jury was guided by the written version. (*People v. Davis* (1995) 10 Cal.4th 463, 542 [41 Cal.Rptr.2d 826, 896 P.2d 119]; *People v. Crittenden* (1994) 9 Cal.4th 83, 138 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. McLain* (1988) 46 Cal.3d 97, 111, fn. 2 [249 Cal.Rptr. 630, 757 P.2d 569].)

Although the trial court erred in modifying CALJIC No. 6.10 to delete mention of the required specific intent to commit the target offense of murder, defendant suffered no prejudice. For a conspiracy to commit murder, intent to commit the target offense means an intent to kill. (*People v. Swain, supra,* 12 Cal.4th at p. 607.) As defendant concedes, the jury's verdict that defendant was guilty of the first degree murder of Teresa Holloway necessarily included a finding that defendant himself had that intent. He argues, however, that the jury made no similar finding for either Denise Shigemura or Anna Humiston, the other alleged conspirators. But defendant does not identify any evidence in the record that could lead a rational juror to conclude that Shigemura and Humiston agreed to kill Holloway, with the specific intent to agree to do so, but without a specific intent to actually kill her. Because we find in the record no evidence that could rationally lead to such a finding, we are satisfied that the instructional error was harmless beyond a reasonable doubt. (*Neder v. United States* (1999) 527 U.S. 1, 9 [144 L.Ed.2d 35, 119 S.Ct. 1827]; *People v. Davis* (2005) 36 Cal.4th 510, 564 [31 Cal.Rptr.3d 96, 115 P.3d 417].)

During guilt phase deliberations, the jury sent a note to the trial judge. It read: "Is the jury merely deciding whether the overt acts alleged actually occurred, or are we also determining whether or not the acts do indeed meet the requirements of being overt acts as defined in CALJIC 6.10[?]" The trial court sent the jury this written response: "As [CALJIC No.] 6.10 states, in order to find Mr. Jurado guilty of conspiracy, you must unanimously find to be true at least one of the alleged Overt Acts, *as that term is defined in 6.10.*" (Italics added.)

Defendant maintains that this response did nothing to answer the jury's question, and that there is an unacceptable risk that the jury merely determined whether the conduct charged as overt acts occurred, without also determining whether any of the acts was committed in furtherance of the conspiracy. We disagree. The trial court's response expressly directed the jury's attention to the definition of an overt act in CALJIC No. 6.10, which stated that " 'overt act' means any step taken or act committed by one or more of the conspirators . . . *in furtherance of the accomplishment of the object of the conspiracy*." (Italics added.) That the jury so understood the court's response is conclusively shown by the jury's findings on the overt acts. The jury found "not true" the overt act allegations that defendant, Denise Shigemura, and Anna Humiston met with Teresa Holloway at Mark Schmidt's residence and that they left Schmidt's residence with Holloway in Humiston's car. Because undisputed evidence established that both of these acts occurred, the jury's "not true" finding can be explained only by inferring that the jury was not satisfied beyond a reasonable doubt that these acts were done in furtherance of the conspiracy.

### E. *Instruction on Motive*

The trial court instructed the jury with this slightly modified version of CALJIC No. 2.51: "Motive is not an element of either one of the crimes charged and, therefore, need not be proved. However, you may consider motive or lack of motive as a circumstance in the case. Presence of motive may tend to establish that an accused is guilty. Absence of motive may tend to establish that he is not guilty of a charged offense. You will therefore give the presence or absence of motive, as you find the case to be, the weight to which you find it to be entitled."

Defendant contends that this instruction improperly allowed the jury to convict him of the charged offenses of capital murder and conspiracy based *solely* on evidence of motive, and in so doing it violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution to due process, a fair trial, and a reliable verdict in a capital case. He points out that in contrast to certain other instructions that the trial court read to the jury—relating to consciousness of guilt based on falsehoods, efforts to suppress evidence, and flight after a crime—each of which included an admonition that the specified circumstance was insufficient by itself to prove guilt—the instruction on motive included no admonition that motive alone was insufficient to prove guilt.

Because it challenges merely the clarity of the instruction, and because defendant did not ask the trial court to modify or clarify the instruction, defendant's contention is not preserved for appellate review. (*People v.*

*Cleveland* (2004) 32 Cal.4th 704, 750 [11 Cal.Rptr.3d 236, 86 P.3d 302].) Had defendant preserved the contention, we would reject it on the merits. What we wrote in *People v. Cleveland* applies with equal force here: "The court fully instructed the jury on the reasonable doubt standard. We find no reasonable likelihood the jury would infer from the motive instruction that motive alone could establish guilt. Moreover, given the strong evidence of guilt aside from motive, the jury certainly did not base its verdicts solely on motive." *(Ibid.)*

F. *Instruction on Lesser Offense*

Defendant contends the trial court erred when it instructed the jury, in the language of CALJIC No. 8.75, that it would not accept a verdict that defendant was guilty of second degree murder unless the jury also unanimously returned a verdict that he was not guilty of first degree murder. Defendant maintains that this "acquittal first" instruction violated his federal constitutional rights to due process and to a fair and reliable jury consideration of lesser included offenses in a capital case.

As defendant concedes, this court has repeatedly rejected the same contention. (E.g., *People v. Nakahara* (2003) 30 Cal.4th 705, 715 [134 Cal.Rptr.2d 223, 68 P.3d 1190].) As we stated in *Nakahara,* "[w]e see no reason for reconsidering these decisions." *(Ibid.)*

G. *Instructions on Consciousness of Guilt*

Defendant contends that the trial court's instructions to the jury on consciousness of guilt were impermissibly argumentative, permitted the jury to draw irrational inferences, were potentially misleading, and were unsupported by the evidence.

The trial court instructed the jury that it could infer consciousness of guilt from efforts to suppress evidence (CALJIC No. 2.06), from flight after a crime (CALJIC No. 2.52), and from the telling of a falsehood (CALJIC No. 2.03). The trial court declined defense requests to modify the instructions to state that they were inapplicable to fix the degree of a crime.

We have repeatedly rejected contentions that these standard jury instructions on consciousness of guilt were impermissibly argumentative or permitted the jury to draw irrational inferences about a defendant's mental state during the commission of the charged offenses. (E.g., *People v. Benavides* (2005) 35 Cal.4th 69, 100 [24 Cal.Rptr.3d 507, 105 P.3d 1099]; *People v. Nakahara, supra,* 30 Cal.4th at p. 713; *People v. Kipp* (1998) 18 Cal.4th 349, 375 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) We see no reason to reconsider these decisions. Because the instructions as given correctly stated

the law and did not invite the jury to draw irrational inferences about defendant's mental state, the trial court did not abuse its discretion in declining the defense requests to modify them.

Whenever the prosecution relies on evidence of flight as tending to show a defendant's guilt, the trial court must instruct the jury substantially in this language: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." (§ 1127c.) In this context, flight "requires neither the physical act of running nor the reaching of a faraway haven" but it does require "a purpose to avoid being observed or arrested." (*People v. Crandell* (1988) 46 Cal.3d 833, 869 [251 Cal.Rptr. 227, 760 P.2d 423]; accord, *People v. Bradford* (1997) 14 Cal.4th 1005, 1055 [60 Cal.Rptr.2d 225, 929 P.2d 544].) "*Mere* return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt [citations], but the *circumstances* of departure from the crime scene may sometimes do so." (*People v. Turner* (1990) 50 Cal.3d 668, 695 [268 Cal.Rptr. 706, 789 P.2d 887]; accord, *People v. Bradford, supra,* at p. 1055.)

Here, the circumstances of defendant's departure from the scene of Teresa Holloway's murder were sufficient to support an inference that his purpose was to avoid being observed or arrested, and thus an inference of consciousness of guilt for her death. Although there was a call box around 20 yards from the culvert in which Holloway's body had been placed, defendant did not use the call box to summon aid after Anna Humiston's car broke down. Instead, defendant, Humiston, and Denise Shigemura walked a half-mile to a 7-Eleven Store, along the way hiding in a tree the scissors jack that had been used to kill Holloway, before calling a friend for assistance. Defendant's failure to use the call box, and the secreting of the murder weapon, support an inference that in leaving the crime scene defendant acted with a purpose to avoid observation and arrest. The flight instruction was properly given.

### H. *Instructions Affecting Burden of Proof*

Defendant contends that certain of the trial court's instructions to the jury misled the jury regarding the reasonable doubt standard of proof and impermissibly lightened the prosecution's burden of proof. He maintains that these instructions violated his federal constitutional rights to due process, a fair trial, a unanimous jury verdict, and reliable guilt and penalty determinations.

We have previously rejected each of the claims that defendant makes, and we decline to reconsider these decisions. Contrary to defendant's

arguments, CALJIC Nos. 2.01, 2.02, 8.83, and 8.83.1, which direct the jury to accept reasonable inferences and to reject unreasonable ones, do not permit the jury to base a determination of guilt on something less than proof beyond a reasonable doubt. (*People v. Harris* (2005) 37 Cal.4th 310, 351 [33 Cal.Rptr.3d 509, 118 P.3d 545]; see also *People v. Crew* (2003) 31 Cal.4th 822, 847 [3 Cal.Rptr.3d 733, 74 P.3d 820]; *People v. Nakahara, supra,* 30 Cal.4th at pp. 713–714.) CALJIC No. 1.00, which directs the jury not to "infer or assume" that defendant "was more likely to be guilty than not guilty" merely because he had been arrested, charged, or brought to trial, does not undercut the burden of proof. (*People v. Crew, supra,* at pp. 847–848; *People v. Nakahara, supra,* at p. 714.) CALJIC No. 2.21.2, the standard instruction on willfully false testimony, does not lighten the prosecution's burden of proof. (*People v. Cleveland, supra,* 32 Cal.4th at p. 751; *People v. Nakahara, supra,* at p. 714; *People v. Maury* (2003) 30 Cal.4th 342, 428–429 [133 Cal.Rptr.2d 561, 68 P.3d 1].) CALJIC No. 2.22, the standard instruction on weighing conflicting testimony, does not undermine the standard of proof beyond a reasonable doubt. (*People v. Cleveland, supra,* 32 Cal.4th at p. 751; *People v. Nakahara, supra,* at p. 714; *People v. Maury, supra,* at p. 429.) Finally, CALJIC No. 8.20, defining premeditation and deliberation, does not suggest that a defendant must absolutely preclude the possibility of premeditation rather than merely raising a reasonable doubt. (*People v. Nakahara, supra,* at p. 715.)

## I. *Cumulative Effect of Errors at Guilt Phase*

Defendant argues that even if no single error requires reversal of the guilt verdicts, the cumulative effect of the errors at the guilt phase must be deemed sufficiently prejudicial to warrant reversal of the guilt verdicts. Defendant has demonstrated few errors, and we have found each error or possible error to be harmless when considered separately. Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the guilt verdicts.

## J. *Constitutional Validity of Lying-in-wait Special Circumstance*

Defendant contends that the lying-in-wait special circumstance (§ 190.2, subd. (a)(15)), as interpreted by this court, violates the Eighth Amendment to the federal Constitution by failing to appropriately narrow the class of persons eligible for the death penalty. "We have repeatedly rejected this contention, and defendant fails to convince us the matter warrants our reconsideration." (*People v. Nakahara, supra,* 30 Cal.4th at p. 721; see also *People v. Vieira, supra,* 35 Cal.4th at p. 303; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1148–1149 [124 Cal.Rptr.2d 373, 52 P.3d 572].)

## IV. ISSUES RELATING TO PENALTY

### A. *Exclusion of Videotape of Interrogation*

Defendant contends that the trial court erred in excluding a videotape of his interrogation by police detectives on May 18, 1991, shortly after his arrest for the murder of Terry Holloway. He further contends that this error violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

As part of its case in mitigation, the defense proposed to have the jury watch a videotape that was made, without defendant's knowledge, while he was being interrogated by police detectives about the murder of Terry Holloway. During the interrogation, defendant at first denied any involvement in the murder, but eventually he admitted killing Holloway, and he insisted that he had done it entirely on his own and that neither Denise Shigemura nor Anna Humiston was present. He said he killed Holloway because he was in danger and his family was in danger. He expressed fear that Brian Johnsen had friends in prison who would kill him or his mother or other family members in retaliation for killing Holloway. He also expressed concern that he would be perceived in prison as a snitch and killed for that reason, or that he would have to spend his entire life in prison. During this part of the interrogation, defendant displayed considerable emotion, sobbing and at one point grasping an interrogating officer's hand. The defense argued that the evidence of defendant's emotional responses was admissible to show his remorse for the killing.

The prosecution objected that the videotape was inadmissible under the hearsay rule (Evid. Code, § 1200), because defendant's emotional displays were assertive conduct, and also under Evidence Code section 352, because the evidence's probative value was substantially outweighed by the risk of undue prejudice and jury confusion. After viewing the videotape, the trial court sustained the hearsay objection and excluded the evidence. The court agreed with the prosecution that defendant's emotional displays were a form of hearsay and not within any exception to the hearsay rule. The court also rejected the defense argument that defendant's constitutional right to present mitigating evidence in a capital case overrode the hearsay rule in this instance. The court noted there was no compelling need for the evidence, because defendant could testify to any remorse he might have felt, and that the evidence was not particularly trustworthy as evidence of remorse because on the videotape defendant never articulated any feelings of sorrow or regret for killing Teresa Holloway, or any sympathy for Holloway or her family, although he did indicate concern for his own safety and well-being, and also concern for his mother and for Anna Humiston. Thus, in the court's view, it

was by no means clear that defendant's emotional display was in any way caused by remorse, and it seemed more likely that it was caused entirely by concern for his own predicament.

The defense raised the issue again after both sides had rested at the penalty phase and the prosecutor had given his closing argument to the jury. Defense counsel requested permission to reopen the evidence to play the videotape for the jury to rebut the prosecutor's assertion, in argument to the jury, that defendant "lacked a conscience." Defense counsel pointed out that during the videotaped interview defendant said, in response to a question asking whether he had received any injuries in his struggle with Teresa Holloway, "The only injury I got is from my, just from my conscience." The trial court denied the request to reopen.

The defense raised the issue a final time after the jury had returned the penalty verdict of death. In a motion for a new trial, the defense argued that the trial court had erred in excluding the videotape. To demonstrate prejudice, the defense submitted declarations by three trial jurors stating that evidence that defendant lacked remorse for killing Teresa Holloway was an important factor in aggravation, and that evidence that defendant had an emotional reaction to the murder and talked about his conscience would have counterbalanced that evidence. The trial court denied the motion for a new trial.

Defendant is correct that, *by themselves*, defendant's emotional displays were nonassertive conduct, and thus not within the hearsay rule. For purposes of the hearsay rule, conduct is assertive if the actor at the time intended the conduct to convey a particular meaning to another person. (Evid. Code, § 225 [defining statement to include "nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression"].) For example, a nod of the head in response to a question calling for a yes-or-no answer, or a gesture pointing to a particular person when asked to identify a perpetrator, are examples of assertive conduct. Here, nothing in the videotape suggests that defendant's emotional responses were voluntary or that he intended them to convey any particular meaning to the interrogating officers.

But the defense sought to introduce more than just evidence of the emotional displays themselves. To explain the significance of the emotional displays, and particularly defendant's statement that as a result of the murder he had received an "injury from [his] conscience," the defense sought to introduce the statements defendant made during the videotaped interview. As defendant must concede, those statements, including assertions and descriptions of his own feelings and other mental states, were hearsay. They were not admissible under the state-of-mind exception to the hearsay rule (Evid. Code, § 1250) if they were made under circumstances indicating a lack of

trustworthiness (*id.*, § 1252). As the trial court correctly determined, the circumstance that defendant made his statements during a postarrest police interrogation, when he had a compelling motive to minimize his culpability for the murder and to play on the sympathies of his interrogators, indicated a lack of trustworthiness. In past decisions, we have upheld the exclusion of self-serving postcrime statements made under similar circumstances. (*People v. Livaditis* (1992) 2 Cal.4th 759, 779–780 [9 Cal.Rptr.2d 72, 831 P.2d 297]; *People v. Edwards* (1991) 54 Cal.3d 787, 820 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People v. Whitt* (1990) 51 Cal.3d 620, 642–643 [274 Cal.Rptr. 252, 798 P.2d 849].)

 We have also rejected the argument that exclusion of this sort of hearsay evidence violates a capital defendant's right to a fair trial and a reliable penalty determination under the federal Constitution. As we have explained, a capital defendant has no federal constitutional right to the admission of evidence lacking trustworthiness, particularly when the defendant seeks to put his own self-serving statements before the jury without subjecting himself to cross-examination. (*People v. Stanley, supra,* 10 Cal.4th at pp. 838–840; *People v. Livaditis, supra,* 2 Cal.4th at p. 780; *People v. Edwards, supra,* 54 Cal.3d at pp. 820–821; *People v. Whitt, supra,* 51 Cal.3d at p. 644.)

In excluding the entire videotape of defendant's postarrest interrogation, the trial court did not err under state law, nor did it violate defendant's rights under the federal Constitution. The defense never offered to redact the videotape to show *only* the nonassertive conduct, and, even if it had done so, any error in excluding the admissible portions of the videotape was harmless.

B. *Murder Victim's Pregnancy*

Before defendant's trial began, the trial court denied his motion to exclude from the penalty phase any evidence that Teresa Holloway was pregnant when defendant murdered her. Defendant contends that the ruling was error because the evidence was irrelevant and unduly prejudicial. He further contends that admission of the evidence violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

 The trial court did not err in admitting evidence of the murder victim's pregnancy at the penalty phase as a circumstance of the offense. The Eighth Amendment to the federal Constitution permits the prosecution, in a capital case, to present evidence about the murder victim and the specific harm that the defendant caused as relevant to the jury's penalty decision. (*Payne v. Tennessee* (1991) 501 U.S. 808, 827 [115 L.Ed.2d 720, 111 S.Ct. 2597]; *People v. Harris, supra,* 37 Cal.4th at p. 351.) In California, the prosecution

may introduce evidence of the specific harm caused by a defendant's crime at the penalty phase in aggravation as a circumstance of the crime (§ 190.3, factor (a)). (*People v. Panah, supra,* 35 Cal.4th at p. 494; *People v. Fierro* (1991) 1 Cal.4th 173, 235 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)

Defendant argues that evidence of the pregnancy was irrelevant because, although the prosecution presented evidence that Terry Holloway told him she was pregnant, there was also uncontradicted evidence that he did not believe it. This court has concluded, however, that facts concerning the victim that are admissible at the penalty phase of a capital trial as circumstances of the crime are not limited to those known to or reasonably foreseeable by the defendant at the time of the murder. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1183 [13 Cal.Rptr.3d 34, 89 P.3d 353]; accord, *People v. Roldan, supra,* 35 Cal.4th at p. 732.)

We also reject defendant's argument that the trial court abused its discretion by not excluding the pregnancy evidence as unduly prejudicial. We have explained the parameters of the trial court's discretion in these situations in this way: " 'On the one hand, it should allow evidence and argument on emotional though relevant subjects that could provide legitimate reasons to sway the jury to show mercy or to impose the ultimate sanction. On the other hand, irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed.' " (*People v. Edwards, supra,* 54 Cal.3d at p. 836, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 864 [180 Cal.Rptr. 640, 640 P.2d 776]; accord, *People v. Panah, supra,* 35 Cal.4th at pp. 494–495; see also *People v. Pollock, supra,* 32 Cal.4th at 1180 [evidence admissible if it "is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case"].) That in murdering Teresa Holloway defendant also terminated the life of a healthy 17-week-old fetus she was carrying was part of the harm caused by defendant's crime and thus was a legitimate, though emotional, consideration for the jury in making its penalty decision. We note also that defendant does not challenge the *manner* in which the evidence was presented, and we conclude it was not presented in an unnecessarily inflammatory way. Therefore, we reject defendant's claim that the trial court abused its discretion in admitting evidence of the victim's pregnancy.

C. *Victim Impact*

Defendant contends that admission of detailed and emotional testimony about the impact of Teresa Holloway's murder on members of her family rendered his penalty trial unfair and unreliable, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the

federal Constitution. He further contends that section 190.3, factor (a), which permits introduction of victim impact evidence as a circumstance of the crime, is unconstitutionally vague, and that retroactive application of case law allowing use of this evidence violates federal constitutional principles of ex post facto and due process.

We have rejected claims that section 190.3, factor (a), is unconstitutionally vague insofar as it permits introduction of victim impact evidence as a circumstance of the crime (*People v. Wilson, supra,* 36 Cal.4th at p. 358; *People v. Boyette* (2002) 29 Cal.4th 381, 445, fn. 12 [127 Cal.Rptr.2d 544, 58 P.3d 391]), and that use of victim impact evidence in trials for capital crimes committed before the United States Supreme Court's decision in *Payne v. Tennessee, supra,* 501 U.S. 808, violates federal constitutional principles of ex post facto and due process (*People v. Brown* (2004) 33 Cal.4th 382, 394–395 [15 Cal.Rptr.3d 624, 93 P.3d 244]). Defendant does not persuade us to reconsider these decisions.

Nor are we persuaded that the trial court erred in failing to exclude victim impact testimony that defendant claims was overly emotional or irrelevant. Three witnesses testified to the impact of Teresa Holloway's murder on members of her family. Carol Holloway, Teresa Holloway's mother-in-law, testified primarily about the impact of the murder on Teresa's young daughter, but also about its impact on herself. James and Joan Cucinotta, Teresa's parents, testified mainly about the impact of the murders on themselves, but also about its impact on their other two children and on their grandchild. The testimony of these three witnesses was relatively brief, comprising just 25 pages in the reporter's transcript. During their testimony, the defense made no objections to any questions put to the witnesses, nor did the defense move to strike any of the answers. During a break in proceedings immediately after the testimony of Carol Holloway, however, the defense moved for a mistrial or in the alternative to preclude any further victim impact testimony. Defense counsel pointed out that as the jury was leaving the courtroom for the break, four of the jurors were "very visibly crying." The trial court denied the motions, although it agreed with defense counsel that at least two of the jurors had been in tears, and the trial court added that defendant had been "crying and sobbing" as well. Later, out of the jury's presence, the trial court observed for the record that during the testimony of Teresa Holloway's parents it had been watching the four jurors that defense counsel had previously identified as crying and that it did not notice "nearly as much emotional response on their part, frankly."

As examples of testimony that was irrelevant, defendant cites, among other things, Joan Cucinotta's testimony that her mother died of cancer shortly after Teresa Holloway's death and that her husband lost his job two weeks after

Holloway's death. By failing to make timely objections during the witnesses' testimony, defendant forfeited the claim that any of the victim impact evidence was irrelevant. (*People v. Wilson, supra,* 36 Cal.4th at p. 357.) In any event, we are satisfied that all of that testimony was relevant. For example, Joan Cucinotta explained that because she did not want to upset her mother during her final illness, she had pretended that Holloway was still alive, which was "very difficult." And James Cucinotta explained that he lost his job "pretty much because of this [meaning Holloway's death]." Thus, all of this testimony was relevant to explain the direct impact of the murder on Holloway's family members.

Defendant provides examples of testimony he considers overly emotional. In the testimony of Teresa Holloway's mother, Joan Cucinotta, defendant cites, among other things, her statements that "there is nothing worse to me than the death of a child," that she lunged at and wanted to hit the detective who told her Holloway was dead, that she visits Holloway's grave every week and at first she would "cry, sobbing, cry and cry, throw [her]self on the grave," and that Holloway's daughter, when she visits the grave, "says a prayer and kisses her [mother's] picture." In the testimony of Holloway's father, James Cucinotta, defendant cites, among other things, his statements that he and his wife visit Holloway's grave every week, that they "couldn't take a look at her [Holloway] for the last time because of the condition that she was in . . . [a]nd of course she'd laid out in the road for a couple days," that while he was making the funeral arrangements for Holloway he "had to stuff everything" (meaning suppress his emotions) and "because of that stuffing, [he] started to do a lot of inappropriate things," his "drinking got out of hand," and he "had to finally go to a treatment center and get that taken care of," that as a result of Holloway's death his son, who was 34 years old, was "not the same anymore" and was "in a recovery home here in San Diego," and that during the first year after Holloway's death he and his wife "didn't even have a holiday in the house," they "didn't have a turkey for Thanksgiving . . . didn't have a Christmas tree for Christmas."

This testimony was not dissimilar from, or significantly more emotion-laden than, other victim impact testimony that has been held admissible. For example, in *Payne v. Tennessee, supra,* 501 U.S. 808, the defendant was convicted of murdering a 28-year-old woman and her two-year-old daughter. At the trial, when asked how the woman's three-year-old son had been affected by the murders of his mother and sister, the boy's grandmother replied: " 'He cries for his mom. He doesn't seem to understand why she doesn't come home. And he cries for his sister Lacie. He comes to me many times during the week and asks me, Grandmama, do you miss my Lacie. And I tell him yes. He says, I'm worried about my Lacie.' " (*Id.* at pp. 814–815.) In *People v. Harris, supra,* 37 Cal.4th 310, the murder victim's mother "described how she learned of the murder, and of the emotional and financial

costs involved in planning and attending the funeral." (*Id.* at p. 328; see also *id.* at pp. 351–352 [holding this evidence properly admitted].) In *People v. Panah, supra,* 35 Cal.4th 395, the murder victim's father testified that before the victim's death, her 16-year-old brother "was the family athlete, and was a '4.0 student,' but, following her death, his grades deteriorated, 'he is drinking a lot and doing drugs,' and would not talk about his sister but 'kept it all inside himself,' and refused to go to counseling." (*Id.* at p. 495.) We concluded that this testimony was "neither irrelevant nor prejudicial but, in context, depicted the 'residual and lasting impact' he 'continued to experience' as a result of [the victim's] murder." (*Ibid.*) In *People v. Boyette, supra,* 29 Cal.4th 381, a murder victim's father "testified and related how close he was with the victim, how her eight-year-old son had said he wanted to die so he could be with his mother, how her six-year-old son had nightmares and would telephone wanting to know where his mother was, and how [the victim] had been in a drug rehabilitation program and had turned her life around." (*Id.* at p. 440; see also *id.* at p. 444 [holding the evidence was properly admitted].) As in these cases, we conclude that the victim impact evidence here "did not surpass constitutional limits." (*Id.* at p. 444.)

The record does not support defendant's suggestion that after hearing the victim impact testimony the jurors were so overwhelmed by emotion that they were unable to make a rational determination of penalty. Of particular significance, the jury deliberated on penalty for five days before reaching its verdict. The length of their deliberations rather strongly implies that, rather than rushing to judgment under the influence of unbridled passion, the jurors arrived at their death verdict only after a full and careful review of the relevant evidence and of the legitimate arguments for and against the death penalty.

### D. *Jail Assault*

Defendant contends that the trial erred in overruling his objections to admission of evidence of his assault on Steven Baldwin, and that this error violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

On April 14, 1994, the prosecution notified defendant that it intended to introduce in aggravation evidence of defendant's assault on Steven Baldwin, which had occurred in July 1991, soon after defendant's arrest. The defense moved to exclude evidence of the incident on the ground that the notice was untimely. After a hearing, the trial court denied the motion without prejudice to its renewal if the trial reached the penalty phase.

Defendant renewed the motion to exclude after the jury returned its guilt verdicts and made its special circumstance finding. In support of the motion,

defendant informed the court that jail documents listing the inmates who were housed in the module where the assault occurred and the employees who worked in that module had been destroyed on or before July 1993, although a report relating to the incident had been preserved. The trial court denied the renewed motion to exclude, rejecting defendant's argument that, in light of the document destruction, use of the incident in aggravation would violate his constitutional right to due process of law. Defendant contends the trial court erred in denying the motions to exclude.

"Section 190.3, factor (b) provides for the admission, during the penalty phase of a capital trial, of evidence of any criminal activity by the defendant involving the use or attempted use of force or violence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1070 [99 Cal.Rptr.2d 1, 5 P.3d 68].) Section 190.3, factor (b), imposes no time limitation on the introduction of unadjudicated violent crimes; rather, it permits the jury to consider a capital defendant's criminally violent conduct occurring at any time during the defendant's life. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1174 [74 Cal.Rptr.2d 121, 954 P.2d 384]; *People v. Williams* (1997) 16 Cal.4th 153, 233 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Thus, evidence of violent criminal activity is admissible even though prosecution of the crime would be time-barred (*People v. Williams, supra,* at p. 233), the right to a speedy trial is not implicated (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1161 [36 Cal.Rptr.2d 235, 885 P.2d 1]), and the defense of laches is not available (*People v. Koontz* (2002) 27 Cal.4th 1041, 1087–1088 [119 Cal.Rptr.2d 859, 46 P.3d 335]). As we have explained, the remoteness in time of a prior incident "goes to its weight, not to its admissibility." (*People v. Catlin* (2001) 26 Cal.4th 81, 172 [109 Cal.Rptr.2d 31, 26 P.3d 357].) Defendant asks us to reconsider these decisions, but he does not persuade us to do so.

Here, as defendant concedes, defendant's assault on Steven Baldwin was not remote in time; indeed, it occurred *after* the charged capital offense, the murder of Teresa Holloway. Defendant nonetheless contends that the trial court should have excluded evidence of the incident because the prosecutor's lack of diligence in discovering the incident and in providing notice of his intention to offer evidence of the incident in aggravation resulted in the destruction of relevant jail records, thereby compromising defendant's ability to defend against the charge.

The prosecutor told the trial court that he first learned of the incident in December 1993 during an interview of Steven Baldwin while preparing the case for trial. Although defendant argues that the prosecutor *could have* discovered the incident earlier, he cites no authority for the proposition that a prosecutor in a death penalty case has an obligation to promptly and diligently search for all available aggravating evidence, or that, if such a duty

exists, exclusion of evidence is an appropriate and lawful sanction for its violation. Thus, defendant fails to persuade us that he suffered any legally cognizable harm as a result of the prosecution's failure to discover the incident at an earlier time.

The prosecution is required to notify a capital defendant of its intended penalty phase evidence "within a reasonable period of time as determined by the court, prior to trial." (§ 190.3.) Notice provided before jury selection begins is generally considered timely, and the purpose of the notice provision is satisfied if the defendant has a reasonable chance to defend against the charge. (*People v. Stitely, supra,* 35 Cal.4th at p. 562.) Here, the prosecutor gave notice to defendant of his intention to introduce evidence of the Baldwin assault 11 days before jury selection began. Defendant then received, or had already received, a report that described the incident and included the names of two inmates, in addition to Baldwin and defendant, who had been present in the module and were questioned about the incident. The trial court did not abuse its discretion in concluding that defendant received timely and adequate notice.

Defendant also argues that the incident was inadmissible because it did not constitute a crime by defendant. Evidence of other criminal activity introduced in the penalty phase under section 190.3, factor (b), must demonstrate "the commission of an actual crime, specifically, the violation of a penal statute." (*People v. Phillips* (1985) 41 Cal.3d 29, 72 [222 Cal.Rptr. 127, 711 P.2d 423]; see also *People v. Kipp, supra,* 26 Cal.4th 1100, 1133; *People v. Boyd* (1985) 38 Cal.3d 762, 772 [215 Cal.Rptr. 1, 700 P.2d 782].) The prosecution did not argue that defendant personally assaulted Baldwin, but instead that he aided and abetted an assault on Baldwin by loudly referring to Baldwin as a "snitch," knowing that snitches are commonly the targets of assault in jail. "[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 259 [58 Cal.Rptr.2d 827, 926 P.2d 1013], quoting *People v. Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318].) On the evidence presented, the jury could reasonably conclude that defendant, acting with the intent to have Baldwin assaulted, and with knowledge that other inmates would likely do so if told that Baldwin was a snitch, encouraged or instigated the assault by openly announcing to the other inmates that Baldwin was a snitch. Defendant's remark to Baldwin after the assault ("You can't be in this cell") supports an inference that defendant orchestrated the assault to achieve his own purposes, intimidation of Baldwin and his removal from the module. Therefore, we reject defendant's argument that the evidence was insufficient to show that defendant violated a penal statute.

### E. *Weapon Possession in Jail*

In regard to the prosecution's evidence at the penalty phase that defendant illegally possessed a weapon in the county jail, defendant claims, first, that the evidence was insufficient to establish that the weapon he possessed was a deadly weapon within the meaning of section 4574; second, that the trial court misinstructed the jury regarding the elements of a section 4574 violation; and, third, that the trial court should not have permitted the jury at the penalty phase to consider the section 4574 violation as an aggravating circumstance because the offense does not necessarily involve an actual or implied threat of violence.

Section 4574 makes it a felony for a county jail inmate to possess a "deadly weapon." Within the meaning of this penal statute, an object is a deadly weapon if it has a reasonable potential of inflicting great bodily injury or death. (*People v. Pollock, supra,* 32 Cal.4th at p. 1178; see *People v. Hughes* (2002) 27 Cal.4th 287, 383 [116 Cal.Rptr.2d 401, 39 P.3d 432].)

Arguing that here the prosecution's evidence was insufficient to establish that the weapon he possessed had a reasonable potential of inflicting great bodily injury or death, defendant asserts that the evidence did not show which of several weapons he possessed and that some of the weapons, such as soap bars in socks, were incapable of inflicting great bodily injury. We disagree with defendant's characterization of the evidence.

Mark Thiede testified, on direct examination, that on September 5, 1993, he was working as a deputy sheriff at the county jail in San Diego when he saw groups of Black and Hispanic inmates facing off against each other in one of the tanks. Several Hispanic inmates had steel poles or posts that they were slamming against the steel bunks and using to make stabbing motions to keep the Black inmates in another part of the room. He later wrote a report identifying four inmates "who possessed weapons." Defendant was one of the four. Asked to describe "with a little more particularity what type of weapons . . . these inmates were possessing," Thiede replied: "The weapons that was used in the riot, they're bars about between 12 and 18 inches long, quarter inch in diameter. There was also socks. They take a sock and they put two, one or two bars of soap in the socks to make it weighted. You can use that as a clubbing instrument. Thin pieces about a half inch wide, five or six inches long with tape on the end that you can sharpen down to a point. Those are I believe the weapons *that were found.*" (Italics added.)

Defendant argues that from this testimony the jury could not determine which weapon, of the several that Deputy Thiede described, he had possessed during the riot, and thus the jury could not determine whether the weapon

satisfied the section 4574 definition of a deadly weapon. The more likely interpretation of this testimony, we think, is that defendant was one of four inmates that Thiede saw wielding the steel poles or posts and that the other weapons were merely found during a later search of the tank. Moreover, any confusion or uncertainty in this regard was dispelled by cross-examination. Defense counsel asked: "You never saw Mr. Jurado, or the person that you identified as Mr. Jurado, *that is, the person in the tank that you said had the pipe*, you never saw that individual strike anybody, did you?" (Italics added.) Thiede replied, "No, I didn't." Thus, the evidence before the jury sufficiently established that defendant possessed one of the steel objects 12 to 18 inches in length—variously described as poles, posts, bars, and pipes—that the inmates were slamming against bunks and using to make stabbing motions. As defendant does not dispute, an object of this sort is capable of inflicting great bodily injury or death, and thus it is a deadly weapon within the meaning of section 4574.

We next consider defendant's claim that the trial court misinstructed the jury regarding the elements of a section 4574 violation. Specifically, the trial court instructed the jury that in reaching the penalty verdict it could consider evidence that defendant had engaged in criminal activity that involved the express or implied use of force or violence or the threat of force or violence. The court then stated: "And indeed, evidence has been introduced during this phase of the trial for the purpose of showing and proving that [defendant] committed the following criminal activity: . . . possession of a weapon in the county jail." Defendant contends that this instruction was inaccurate or at least misleading because it referred merely to "a weapon" rather than "a deadly weapon."

As defendant recognizes, we considered a similar claim in *People v. Hughes, supra,* 27 Cal.4th 287. There, the prosecution introduced evidence at the penalty phase of a capital trial that the defendant while in a county jail had possessed "a four-inch, slightly bent but straightened, hard, sharp object with a loop at the end." (*Id.* at p. 381.) The trial court instructed the jury that " 'evidence has been introduced for the purpose of showing that the defendant has committed the following criminal act: possession of a sharpened instrument while confined in the county jail . . . .' " (*Id.* at p. 382.) We concluded that the trial court had erred in instructing in these terms because possessing a sharpened instrument while confined in the county jail "was, at the time, and without more (that is, a showing that the object was a deadly weapon), not a crime." (*Id.* at p. 383.) The trial court's instruction "should have used the words 'deadly weapon' rather than 'sharpened instrument,' " an error we characterized as "minor." (*Id.* at p. 384.)

We also concluded, beyond a reasonable doubt, that the defendant was not prejudiced by the error. We observed that the object the defendant had

possessed qualified as deadly weapon under section 4574. (*People v. Hughes, supra,* 27 Cal.4th at p. 383.) We reasoned: "To find prejudice, we would need to hypothesize two things, which tend to be self-canceling: (i) that the jury would consider the shank, although a sharpened instrument, not to be a deadly weapon, and (ii) that despite such a finding, the jury nonetheless considered the evidence to be so important that it affected the penalty determination. [¶] It is quite unlikely that the jury would find the object to be a sharpened instrument but not a deadly weapon. But if the jury made that improbable finding, thus minimizing the seriousness of the evidence, it is also quite unlikely that it would then consider the evidence to be so important as to control, or even have a significant impact upon, the penalty determination." (*Id.* at p. 384; see also *People v. Pollock, supra,* 32 Cal.4th at p. 1179.)

Similarly here, we conclude that defendant was not prejudiced by the trial court's description of the alleged criminal conduct as defendant's possession of a "weapon" rather than a "deadly weapon." It is quite unlikely that the jury would view the object that defendant possessed—a steel rod or bar 12 to 18 inches in length—as a weapon but not a deadly weapon. It is also quite unlikely that if the jury made such an improbable finding, it would then nonetheless treat the incident as sufficiently aggravating to have affected the penalty verdict. The combination of these improbabilities persuades us beyond a reasonable doubt that the instructional error was harmless.

Defendant also argues that the instruction was erroneous insofar as it required the jury to treat defendant's possession of a deadly weapon in county jail as aggravating without making its own determination that the conduct involved actual or threatened force or violence. Defendant argues that the instruction precluded the jury from considering any possible innocent explanation for his weapon possession. We have previously rejected this argument (*People v. Gray, supra,* 37 Cal.4th at p. 235; *People v. Monterroso* (2004) 34 Cal.4th 743, 793 [22 Cal.Rptr.3d 1, 101 P.3d 956]), and defendant does not persuade us to reconsider these decisions.

Finally, we reject defendant's argument that the trial court should not have permitted the jury at the penalty phase to consider the section 4574 violation as an aggravating circumstance because the offense does not necessarily involve illegal violence. This court has consistently concluded, to the contrary, that a prisoner's possession of a weapon is conduct that necessarily involves an actual or implied threat to use force or violence. (E.g., *People v. Hines* (1997) 15 Cal.4th 997, 1057 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *People v. Ramirez* (1990) 50 Cal.3d 1158, 1186–1187 [270 Cal.Rptr. 286, 791 P.2d 965]; *People v. Harris* (1981) 28 Cal.3d 935, 962–963 [171 Cal.Rptr. 679, 623 P.2d 240].) "The trier of fact is free to consider any 'innocent explanation' for defendant's possession of the item, but such inferences do not render the

evidence inadmissible per se." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 589 [15 Cal.Rptr.2d 382, 842 P.2d 1142].)

### F. Lack of Remorse

Defendant claims the death judgment must be reversed because the prosecutor improperly urged the jury to consider defendant's lack of remorse after the crime as an aggravating circumstance.

During his argument to the jury at the conclusion of the penalty phase, the prosecutor began to read the testimony of Christie Medlin about statements defendant had made to her during telephone calls after the murder of Teresa Holloway. Defense counsel interrupted and asked to approach the bench, where he argued that defendant's postoffense statements were "inappropriate evidence in aggravation to show lack of remorse," and that the court should not permit the prosecutor to make an argument urging the jury to view defendant's postoffense lack of remorse as aggravating. The court overruled the objection, noting that defendant's postoffense statements could properly be used in aggravation insofar as they constituted circumstantial evidence of his state of mind during the crime. The prosecutor then quoted defendant's postoffense statements that "the bitch is gone" and that he did not care if he had to spend the rest of his life paying for it. The prosecutor argued that this showed "the state of mind of [defendant] at or about the time this crime occurred as to his idea of punishment."

The prosecutor then discussed evidence showing that defendant knew that killing Teresa Holloway was wrong. The prosecutor mentioned that there were seven factors in aggravation and mitigation that the jury would be asked to consider, and that the jury was not merely to count the factors on each side but was to weight them to determine their "convincing force." As factors in aggravation, the prosecutor mentioned and discussed the circumstances of the crime, including the victim impact testimony, the presence or absence of criminal activity involving force or violence, and the presence or absence of prior felony convictions. The prosecutor mentioned and discussed whether the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance; whether at the time of the offense defendant had the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, and whether that capacity was impaired by intoxication; defendant's age at the time of the crime; and "the last factor," which was "any other circumstances which extenuate the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence of less than death."

In connection with this last factor, the prosecutor discussed the evidence that the defense had presented during its case in mitigation. During this discussion, the prosecutor made this argument, which defendant now challenges: "I listened as the defense witnesses testified yesterday for any evidence or testimony pertaining to the victim. And there was. There was. The defendant's grandmother testified, bless her heart, that she not only prays for [defendant] but she prays for the victim and the victim's family. What a nice thing. What a human thing. What a nice person from a nice family. [¶] When she testified to that I kind of thought back in the evidence that was presented in the guilt phase and the penalty phase, about the defendant and his view of the victim. After the murder of Terry Holloway, she had only been in the drainage ditch a matter of minutes, what was [defendant] doing at Christie Medlin's house? He was playing darts. What was he doing the next day with Denise Shigemura while the victim still lay cold in the drainage ditch? He was having pizza and beer. [¶] And after he got arrested and he talked to Christie Medlin on the telephone, how did he feel about the victim at that time, right around the time of the crime? 'On, on, the bitch is gone.' [¶] And when he identified Steve Baldwin as a snitch in the county jail, what were his words? 'That's the guy who told the cops I killed the bitch.' [¶] What's his grandmother doing during this time? She's praying for the victim. [¶] Do you see what I mean? He's not like them. He doesn't share in their goodness, he doesn't share in their compassion, he doesn't share in their humanity. [¶] I think those statements that he made in the presence of Baldwin and in the presence or on the telephone to Christie Medlin tell you who the real Robert Jurado is. All right out there, very clear and open for you to understand and evaluate."

■ Although a prosecutor in a capital case may not argue that a defendant's postcrime lack of remorse is an aggravating factor, a prosecutor may, as the prosecutor did here, argue that lack of remorse is relevant to the evaluation of mitigating factors. (*People v. Pollock, supra,* 32 Cal.4th at p. 1186; *People v. Mendoza* (2000) 24 Cal.4th 130, 187 [99 Cal.Rptr.2d 485, 6 P.3d 150].) The prosecutor here never suggested that lack of remorse was an aggravating factor, and he did not refer to lack of remorse during the portion of his argument devoted to the discussion of aggravating factors. Instead, the challenged argument occurred during the course of the prosecutor's review of the defense case in mitigation and the potential mitigating factors. A reasonable juror likely would have understood the prosecutor's argument to be that defendant's failure to demonstrate any concern for the woman he had killed meant "that remorse was not available as a mitigating factor and also that defendant was not entitled to the jury's sympathy." (*People v. Pollock, supra,* at p. 1186.)

### G. *Incidents Between Defendant and His Mother*

Defendant argues that the trial court should have exercised its discretion to exclude, as inflammatory and lacking in probative value, the evidence that on one occasion he pushed and spit on his mother, and on another occasion he approached with raised arm as if to strike her and threatened to kill her and shoot up the house. He further argues that admission of this evidence violated his statutory and due process right that the penalty evidence admitted against him be limited to evidence relevant to a factor listed under section 190.3, and his constitutional rights under the Fifth, Eighth, and Fourteenth Amendments to due process, a fair penalty trial, and reliability in the determination of capital punishment.

■ We reject the argument that defendant's conduct toward his mother was not admissible under section 190.3, factor (b), as criminal activity that involved the use or attempted use of force or violence or the express or implied threat to use force or violence. Defendant does not argue that his conduct did not violate a penal statute, nor does he argue that it did not involve the use or attempted use of force or violence or the express or implied threat to use force or violence. Instead, he argues that the evidence was "not the kind of evidence that justified sentencing [him] to execution," because it is "unfortunately not that uncommon for a teenager or a nineteen-year-old to have such confrontations with his parents." But the admissibility of section 190.3, factor (b), evidence does not depend on how common or uncommon the criminal conduct is, or whether *viewed in isolation* it would be sufficient to justify a death sentence. The evidence met all statutory requirements for admission under section 190.3, factor (b).

We reject also defendant's argument that the trial court should have exercised its discretion under Evidence Code section 352 to exclude the evidence on the ground that its probative value was substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. As we have explained, Evidence Code section 352 does not give the trial court discretion to exclude all evidence of a criminal incident that is admissible under section 190.3, factor (b). (*People v. Cunningham* (2001) 25 Cal.4th 926, 1017 [108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Anderson* (2001) 25 Cal.4th 543, 586 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Sanders* (1995) 11 Cal.4th 475, 542–543 [46 Cal.Rptr.2d 751, 905 P.2d 420].)

Nor are we persuaded by defendant's constitutional arguments, which are based on the unrealistic perspective of viewing this evidence in isolation from all the other evidence offered in aggravation and mitigation at the penalty phase, including the circumstances of the capital offense. In the context of the entire penalty determination process, we find nothing improper or unfair

about allowing the jury to consider each occasion during defendant's life when he violated a penal statute by conduct that involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

## H. *Reasonable Doubt Standard*

Defendant claims that his death sentence must be reversed because the trial court did not instruct the jurors to return a death verdict only if they were persuaded beyond a reasonable doubt that the aggravating circumstances were so substantial in comparison with the mitigating circumstances that the death penalty was justified. As defendant acknowledges, this court has held that "neither the federal nor the state Constitution requires the jury to agree unanimously as to aggravating factors, or to find beyond a reasonable doubt that aggravating factors exist, that they outweigh mitigating factors, or that death is the appropriate sentence." (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1255 [69 Cal.Rptr.2d 784, 947 P.2d 1321].) Defendant urges us to reconsider this holding in light of the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona, supra,* 536 U.S. 584, and *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]. We have already done so, and we have concluded that these decisions do not require us to alter our previous conclusion on this point. (*People v. Cornwell* (2005) 37 Cal.4th 50, 103–104 [33 Cal.Rptr.3d 1, 117 P.3d 622]; *People v. Morrison* (2004) 34 Cal.4th 698, 730–731 [21 Cal.Rptr.3d 682, 101 P.3d 568].)

## I. *Unanimity on Aggravating Circumstances*

Defendant contends that the trial court erred in not instructing the jury that unanimity was required before a particular circumstance could be considered aggravating. As defendant acknowledges, this court has consistently rejected this argument (e.g., *People v. Gray, supra,* 37 Cal.4th at p. 236; *People v. Morrison, supra,* 34 Cal.4th at pp. 730–731), and he fails to persuade us to reconsider these holdings.

## J. *Aggravating and Mitigating Circumstances*

Contrary to defendant's contention, "[t]he trial court was not constitution-ally required to inform the jury that certain sentencing factors were relevant only in mitigation, and the statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors." (*People v. Morrison, supra,* 34 Cal.4th at p. 730; accord, *People v. Gray, supra,* 37 Cal.4th at p. 237.)

Defendant argues, however, that certain instructions given in this case created an unacceptable risk that the jurors would treat as aggravating a circumstance that could only be mitigating. First, the trial court modified the standard jury instruction on penalty factors, CALJIC No. 8.85. After listing the seven factors that the parties had agreed were relevant to penalty determination in this case, the instruction stated: "The circumstances in the above list which you determine to be aggravating are the only ones which the law permits you to consider." The instruction also stated, however, that "[t]he absence of a statutory mitigating circumstances does not constitute an aggravating circumstance."

Second, during penalty deliberations, the jury sent the trial court a note with this question: "Can we consider the conspiracy to kill Doug Mynatt a 'circumstance of the crime,' as this term is used in CALJIC [No.] 8.85.(a)?" The trial court replied: "Yes, it can be considered as a 'circumstance of the crime' under CALJIC [No.] 8.85(a), as either a circumstance in aggravation or mitigation." Defendant suggests that this reply would cause the jury to conclude that it could consider *any* of the statutory factors as either aggravating or mitigating. We disagree. On the same day, the jurors also sent the trial court a note asking whether section 190.3, factor (k), as described in CALJIC No. 8.85 ("Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial") could be either mitigating or aggravating. The trial court replied that this factor was "mitigating only." Thus, no reasonable juror could have been misled into believing that any factor could be either aggravating or mitigating.

### K. *Absence of Written Findings*

Defendant claims that California's death penalty law is unconstitutional because it does not require the jury to make a written statement of findings and reasons for its death verdict. This court has consistently rejected this claim (e.g., *People v. Gray, supra,* 37 Cal.4th at p. 236; *People v. Cornwell, supra,* 37 Cal.4th at p. 105; *People v. Morrison, supra,* 34 Cal.4th at pp. 730–731), and defendant does not persuade us to reconsider these decisions.

### L. *Cumulative Effect of Errors*

Defendant claims that the judgment must be reversed because of the cumulative effect of errors at both the guilt and penalty phases of his trial. Defendant has demonstrated few errors at either phase of the trial, and we

have found each error or possible error to be harmless when considered separately. Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment.

## V. Disposition

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**KENNARD, J.,** Concurring.—In 1993, in a concurring opinion in a noncapital case (*People v. Ceja* (1993) 4 Cal.4th 1134 [17 Cal.Rptr.2d 375, 847 P.2d 55]), I expressed a "growing concern" that the definition of lying in wait that this court had earlier adopted in *People v. Morales* (1989) 48 Cal.3d 527 [257 Cal.Rptr. 64, 770 P.2d 244] "may have undermined the critical narrowing function of the lying-in-wait special circumstance: to separate defendants whose acts warrant the death penalty from those defendant who are 'merely' guilty of first degree murder." (*People v. Ceja, supra,* at p. 1147.) I expressed this concern again in separate opinions in *People v. Hillhouse* (2002) 27 Cal.4th 469, 512 [117 Cal.Rptr.2d 45, 40 P.3d 754], and *People v. Combs* (2004) 34 Cal.4th 821, 869 [22 Cal.Rptr.3d 61, 101 P.3d 1007]. In none of these cases, however, did I indicate how I would decide this constitutional issue.

During the same period, without writing separately, I have concurred in decisions affirming judgments of death based in part on lying-in-wait special circumstances, including decisions rejecting claims that the lying-in-wait special circumstance is unconstitutional because it does not adequately narrow the class of death-eligible defendants. In each of these cases, however, the issue was not squarely presented because other special circumstances had been found true and the lying-in-wait special circumstance had no effect on the evidence presented at the penalty phase. (See *Brown v. Sanders* (2006) 546 U.S. 212 [163 L.Ed.2d 723, 126 S.Ct. 884]; *People v. Combs, supra,* 34 Cal.4th 821, 869.) Since I expressed concern about the lying-in-wait special circumstance in *People v. Ceja, supra,* 4 Cal.4th 1134, this court has not, until now, affirmed a judgment of death in which lying in wait was the only special circumstance. In this case, however, no other special circumstance was alleged, and defendant's eligibility for the death penalty is based solely on the jury's finding that defendant murdered Teresa Holloway while lying in wait. For this reason, I have taken a careful look at the constitutional issue to which I alluded in 1993.

Since 1972, the United States Supreme Court has "required States to limit the class of murderers to which the death penalty may be applied." (*Brown v. Sanders, supra,* 546 U.S. at p. 216 [126 S.Ct. at p. 889].) The court announced that requirement in *Furman v. Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]. Justice White's concurring opinion in *Furman* identified the problem in the death penalty systems of Georgia and other states as the absence of a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." (*Id.* at p. 313.) In 1980, Justice Stewart's plurality opinion in *Godfrey v. Georgia* (1980) 446 U.S. 420, 427 [64 L.Ed.2d 398, 100 S.Ct. 1759], converted this description into a requirement: "A capital sentencing scheme must, in short, provide a ' "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." ' "

Over the ensuing years, the decisions of the United States Supreme Court gradually dispelled the impression that to satisfy the federal Constitution's narrowing requirement only a small percentage of murders may be punishable by death. (See, e.g., *Arave v. Creech* (1993) 507 U.S. 463, 475 [123 L.Ed.2d 188, 113 S.Ct. 1534].) In 1994, the court summarized in rather precise terms the federal Constitution's requirements for death eligibility in a homicide case: "To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase. [Citations.] The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both). [Citation.] As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. [Citation.] Second, the aggravating circumstance may not be unconstitutionally vague. [Citations.]" (*Tuilaepa v. California* (1994) 512 U.S. 967, 971–972 [129 L.Ed.2d 750, 114 S.Ct. 2630].) Under California's death penalty law, the special circumstances listed in Penal Code section 190.2 function as the "aggravating circumstances" making a defendant eligible for the death penalty. (*Brown v. Sanders, supra,* 546 U.S. at p. 227 [126 S.Ct. at p. 892]; *People v. Bacigalupo* (1993) 6 Cal.4th 457, 467–468 [24 Cal.Rptr.2d 808, 862 P.2d 808].)

The lying-in-wait special circumstance (Pen. Code, § 190.2, subd. (a)(15)), as this court defined it in *People v. Morales, supra,* 48 Cal.3d at page 557, satisfies the constitutional requirements that the United States Supreme Court articulated in *Tuilaepa v. California, supra,* 512 U.S. 967. The special circumstance applies only to a subclass of murderers, not to all murderers, and it is not unconstitutionally vague; therefore, it satisfies the federal Constitution's narrowing requirement for a death-eligibility factor. (See *People v. Moon* (2005) 37 Cal.4th 1, 44 [32 Cal.Rptr.3d 894, 117 P.3d 591];

*People v. Nakahara* (2003) 30 Cal.4th 705, 721 [134 Cal.Rptr.2d 223, 68 P.3d 1190]; *People v. Gutierrez* (2002) 28 Cal.4th 1083 [124 Cal.Rptr.2d 373, 52 P.3d 572]; see also *Morales v. Woodford* (9th Cir. 2004) 388 F.3d 1159, 1174–1178, cert. den. *sub nom. Morales v. Brown* (2005) 546 U.S. 935 [163 L.Ed.2d 320, 126 S.Ct. 420]; *People v. Earp* (1999) 20 Cal.4th 826, 904–905 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Sanchez* (1995) 12 Cal.4th 1, 60–61 [47 Cal.Rptr.2d 843, 906 P.2d 1129].)